IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE STONEPATH GROUP, INC.    :    CIVIL ACTION
SECURITIES LITIGATION          :
                                 :
                                 :
                                 :    NO. 04-4515

MEMORANDUM

Dalzell, J.                           October 27, 2005

This is a putative class action brought on behalf of purchasers of Stonepath Group, Inc. securities between March 29, 2002 and September 20, 2004 (the claimed "Class Period").  Lead plaintiff Globis Capital Partners, L.P., here sues nominal defendant Stonepath and three of its current and former officers and directors, Dennis L. Pelino, Bohn H. Crain and Thomas L. Scully (collectively the "Individual Defendants") for violations of the Securities Exchange Act of 1934.  We now address the defendants' motion to dismiss, which largely challenges whether plaintiffs have sufficiently pleaded the requisite scienter.[1]

---

[1] The Court may grant a motion to dismiss under Rule 12(b)(6) "only if, accepting all well pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief."  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1420 (3d Cir. 1997).  "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).  In other words, we will not grant such a motion "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Conley v. Gibson, 355 U.S. 41, 45-46 (1957); see also Semerenko v. Cendant Corp., 223 F.3d 165, 173 (3d Cir. 2000) (permitting dismissal "only if it appears that the [plaintiffs] could prove no set of facts that would entitle [them] to relief").  "The complaint will be deemed to have alleged sufficient facts if it adequately put the defendants on notice of the essential elements of the plaintiffs' cause of action."  Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996).  We shall review factual background for plaintiffs' claims with these principles in mind.

Factual Background

        Stonepath is said to be "a non-asset based third-party logistics services company providing supply chain solutions on a global basis."  Am. Consolidated Class Action Compl. ("Compl.") ¶ 3.  It is incorporated in Delaware and maintains its principal place of business in Philadelphia.  Id. ¶ 33.  The company derives income primarily from freight forwarding, customs brokerage and warehousing.  Id. ¶ 3.  As a freight forwarder, Stonepath does not own or lease any significant equipment.  Id. It generates most revenues "by purchasing transportation services from direct (asset-based) carriers" to transport the property of Stonepath's customers.[2]  Id.

        According to Stonepath's annual reports for 2001 and 2003 and its amended annual report for 2002, the company's "strategic objective is to build a leading global logistics services organization that integrates established logistics companies with innovative technologies."  Id. ¶ 52.  To achieve the objective, Stonepath stated it was "pursuing an aggressive acquisition strategy" to build on its position in current markets and acquire operations in new markets.  Id.  Two of its early acquisitions were M.G.R., Inc. (d/b/a Air Plus Limited) and its operating affiliates (collectively "Air Plus") and Global

---

   [2] The current business model was adopted in the first quarter of 2001.  Prior to that time, Stonepath had focused on "developing early-stage technology businesses with significant Internet features."  Compl. ¶ 4, 51.  Stonepath is said to have changed its business model due to declines in the technology business and access to venture financing.  Id. ¶ 4.

Transportation Services ("Global"), acquired on October 5, 2001, and on April 4, 2002, respectively. Id. ¶ 53. Air Plus is said to have "provided the platform[3] for Stonepath's Domestic Services organization," while "Global provided the platform for [Stonepath's] International Services organization." Id.

To fund further acquisitions and provide on-going working capital, on May 15, 2002, Stonepath obtained a revolving credit facility of $15 million from LaSalle Business Credit, Inc. Id. ¶ 57. This facility included a covenant that limited funded debt to no more than 2.75 times Stonepath's consolidated earnings before interest, taxes, depreciation and amortization ("EBITDA"). Id. The remedy for breach of the covenant was the acceleration of all outstanding debt under the agreement. Id. About two years later, on July 28, 2004, the credit facility was increased to $25 million, and the covenant's terms were amended to provide that Stonepath's domestic funded debt could not exceed a 3.75 multiple of its domestic EBITDA. Id.

From May 30, 2002 through February 9, 2004, Stonepath made eleven acquisitions. See id. ¶¶ 54-55. Because of so many acquisitions, Stonepath was subject to large and frequent "one-time non-cash amortization charges." Id. ¶ 56. These charges prompted Stonepath to announce -- in a July 17, 2003 press release and the 2003 Form 10-K -- that EBITDA was the most meaningful measure of the company's financial performance. Id.

---

[3] A "platform acquisition" is "one that creates a significant new capability for the Company, or entry into a new global geography." Id. ¶ 53.

The Stonepath-acquired companies used disparate information systems and operating policies and procedures.  Id. ¶¶ 6, 58.  During the Class Period, Stonepath stated that it was in the process of integrating the various information systems and that it intended to create its own "best-of-breed" solution, called Technology in Logistics or Tech-Logis.  Id. ¶¶ 6, 59. While developing Tech-Logis, Stonepath permitted acquired companies to continue using their pre-existing, or legacy, information systems, as well as their own operating policies and procedures.  Id. ¶ 6.

Using information said to have been provided by confidential witnesses,[4] the complaint details various problems with these legacy systems, as well as accounting problems and difficulties with paying vendors and carriers on time.

Global's legacy information system, the Global system, was used mostly to record shipment data for international operations.  Id. ¶ 74.  According to Confidential Witness (CW) 5,[5] the Global system regularly rejected charges, failed to record charges, crashed, and sometimes generated cost figures

---

[4] For confidential witnesses, the "underlying prerequisite [is] that each source is described sufficiently to support the probability that the source possesses the information alleged." Cal. Pub. Employees' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 155 (3d Cir. 2004).

[5] CW5 is said to be a former Transportation Coordinator at Stonepath's Government Services Division in Sterling, Virginia, who worked for Stonepath from April 2003 until December 2003. Compl. ¶ 75.  CW5 was responsible for the movement of international and domestic shipments and used both Freight Soft and the Global system.  Id.

that had not been entered.  Stonepath's staff at its Government Services Division tried to make the Global system work properly, but could not.  Id. ¶ 77.  In late June or early July 2003, upper management in CW5's office directed CW5 to record all international shipments in the Freight Soft information system. Id.  This was purportedly done to correct accounting problems and phase out the Global system.  Id.  During the summer of 2003, CW5 was told that some data was "being double read" because the Freight Soft and Global systems were both generating reports for the same international shipments.  Id. ¶ 78.

Stonepath had acquired Freight Soft when it purchased Air Plus, and Freight Soft continued to be used throughout Stonepath's Domestic Services organization.  Id. ¶ 62.  According to CW2, Freight Soft used transportation cost estimates based on pre-programmed carrier rates, rather than actual purchased transportation costs.[6]  Id.  Some of these carrier rates are said

---

[6] CW2 is claimed to be a former Lead Technician in the Rate Management Team in the IT department at Domestic Services' headquarters in Eagan, Minnesota.  Id. ¶ 64.  CW2 worked for Stonepath from August 2003 until November 2004.  Id.  During that time CW2 worked with the Tech-Logis system, and was responsible for updating carrier and vendor rates and services, correcting file loading errors, and analyzing data for accuracy. CW2 reported to Dustin Nelson, who reported to Tim Ritter, Director of Operations of Domestic Services.  Id.  According to CW2, the problem with stale rates developed when carriers and vendors, who generally increased their rates annually, did not provide Air Plus, and later Stonepath, with new electronic tapes or hard copies with updated rate data.  Id. ¶ 65.  Also, some carriers and vendors who provided new electronic tapes failed to update their own rate increases.  Id.

to have been four to five years outdated.[7]  Id. ¶ 65.
Stonepath's policy of allowing acquired companies to use existing
operating policies and procedures meant that Air Plus's
procedures and internal guidelines governed what was now the
Domestic Services organization.  Id. ¶ 66.  However, CW2 states
that Air Plus had no procedures and guidelines for monitoring of
tariff and vendor rates prior to being acquired.  Id.  As a
result, the Domestic Services organization also lacked any
procedures or policies for monitoring its tariff and vendor
rates.  Id.

       According to CW2, the rates' staleness became clear
while Stonepath was attempting to transition the Domestic
Services division from Freight Soft to Tech-Logis, from December
2003 to January 2004.  Id. ¶ 67.  The Carrier Management Team
(CMT) saw large discrepancies between Freight Soft's rate data
and the rates in invoices that carriers submitted, and determined
that the discrepancies stemmed from the use of outdated carrier
rate data.  Id. ¶¶ 15, 67, 309.  CW2 states that the CMT
immediately reported these discrepancies to Tim Anderson,
Domestic Services' Controller.  Id. ¶ 67.  In early January 2004,
Anderson is said to have directed the CMT to contact all carriers
with which Stonepath did business to obtain updated tariff rates

---

[7] CW3 corroborated that much of Freight Soft's rate data was
outdated and "useless."  Id. ¶ 69.  CW3 is a former Data Rates
Technician Manager who also worked in Domestic Services'
headquarters and, for one and a half years, was in charge of
importing all cost-related items from the Freight Soft program
into Tech-Logis.  Id. ¶ 68.

that were to be loaded into Tech-Logis.[8]  Id.

     CW4[9] identified two further problems with Freight Soft. First, it could not process costs for "multiple stops."  Id. ¶ 71.  It generated a single master shipping manifest for a customer, such as Best Buy Co., Inc., Stonepath's largest customer, even though multiple shipments had been delivered by various carriers -- who charged varying rates -- to different store locations on different dates.  Id.  Because of the many variables involved, making accurate lump-sum cost estimates on the manifests was not possible.  Id. ¶¶ 71-72.  Second, when Stonepath closed out shipping manifests at the end of each month, carriers had sometimes not yet invoiced Stonepath.  Id. ¶ 73. Because Freight Soft required cost data to be entered before closing out manifests, Stonepath's regional management told CW4 to either "zero-out" costs or enter $0.01.  Id.

     CW4 and CW8[10] also explain that terminal managers were

---

[8] CW3 corroborated that CMT had to obtain new rate data from the carriers.  Id. ¶ 69.

[9] CW4 is said to be a former terminal manager who worked for Air Plus prior to its acquisition and then for the Domestic Services division until September 2004.  Id. ¶ 70.  CW4 oversaw a large-scale distribution program, receiving and shipping outbound merchandise in three states for Stonepath's largest customer, Best Buy Co., Inc. ("Best Buy").  Id.

[10] CW8 is reported to be a former Assistant Terminal Manager who worked at Domestic Services' Plainfield Business Center in Indiana from September 2003 to May 2004.  Id. ¶ 84.  CW8's responsibilities included maintaining profitability at the Plainfield facility, which twice weekly handled shipment of entertainment software to all Best Buy stores in the country. Id.  CW8 states this was the largest portion of Stonepath's Best Buy business.  Id.

not required to obtain prior authorization for special deliveries or other related delivery costs.  Id. ¶¶ 83-85.  According to CW8, at the Plainfield facility of the Domestic Services organization, special delivery expenditures were often a large part of the facility's costs due to late processing.  Id. ¶¶ 84-85.  CW8 submitted a report on this problem, "Daily Freight Accounting Process," to Jim Such, Regional Vice-President of the Domestic Services organization.  Id. ¶ 85.

A different problem arose with accounting programs.  In January 2004, Tim Anderson directed the Romulus, Michigan office of the Domestic Services division to switch from the Champ accounting system to Stonepath's Great Plains accounting system.  According to CW6[11] and CW7,[12] the Great Plains system had limitations that resulted in financial reporting inaccuracies.  Id. ¶¶ 80, 82.  Specifically, the system did not allow the entry of vendor invoice data for closed months.  Id. ¶¶ 81-82.  Personnel in the Romulus office entered the data the following month, resulting in vendor costs consistently being reported late.  Id.

---

[11] CW6 is a former Operations Coordinator in the Accounts Payable Department of the Domestic Services division's Romulus, Michigan office.  Id. ¶ 79.  CW6 had joined United American Freight Services ("United") in 2002, two months before Stonepath acquired it, and stayed with Stonepath until January 2005.  Id.

[12] CW7 is a former Human Resources employee who also performed accounting work at the Romulus office.  Id. ¶ 82.  CW7 had worked for United for twenty years prior to its acquisition, and continued to work for Stonepath until November 2004.  Id.

Two other former Stonepath employees, CW9[13] and CW10,[14] described Stonepath's delays in paying vendors.  CW9, who worked at Domestic Services' headquarters, stated that around August 2003, Stonepath stopped doing regular weekly check runs and delayed vendor payments, sometimes by three weeks.  Id. ¶ 317. About a quarter of the carriers decided to only do business with Stonepath in cash.  Id.  CW10, who worked at the Romulus office, stated that Stonepath stopped paying vendors on time after it acquired United American Freight Services ("United") in May 2002, so many vendors put the Romulus office on a cash-only basis.  Id. ¶¶ 318-19.  Within a month and a half of Stonepath's acquisition, almost 100 carriers had also moved to a cash-only basis.  Id. ¶ 319.  Stonepath delayed payments to some carriers for as long as a month, lost discount advantages on freight charges, and received daily complaint calls from vendors, which increased from May 2002 to December 2004 to more than 100 a day.  Id.

During the Class Period, Stonepath issued three restatements revising figures it had previously reported to the Securities and Exchange Commission.

On July 17, 2003, Stonepath issued a press release

---

[13] CW9 is a former Stonepath employee who worked as an Accounts Payable Auditor at Domestic Services's headquarters in Eagan, Minnesota from June 2003 through March 2004.  Id. ¶ 317.

[14] CW10 is said to be a former Operations Coordinator in the Accounts Payable Department of Domestic Services's Romulus, Michigan location.  Id. ¶ 318.  CW10 began working for American Freight Services in March 2002, and when it was acquired by Stonepath two months later, CW10 continued working for Stonepath until January 5, 2005.  Id.

stating that it was discussing with the SEC the allocation of the
purchase price from certain acquired companies -- Air Plus,
Global and United.  Id. ¶ 86.  Then, on August 28, 2003,
Stonepath made its first Class Period restatement when it filed
with the SEC an amended interim financial report on a Form
10-Q/A.  This restated its consolidated financial statements for
the periods ended June 30, 2003 and March 31, 2003, and for the
years ended December 31, 2001 and December 31, 2002.  Id. ¶ 89.
According to the Form 10-Q/A, the restatement related to:

> (i) allocating more value to the customer
> relationship intangible assets for the
> Company's acquisitions and (ii) revising the
> amortization method and life used for such
> assets. The restatement did not impact the
> amounts presented in the consolidated
> statements of cash flows for net cash used in
> operating activities, net cash used in
> investing activities or net cash provided by
> (used in) financing activities in any of the
> restated periods . . . .

Id.

On December 29, 2003, Stonepath issued a press release
announcing its second Class Period restatement, necessitated by a
problem in the legacy accounting process of the International
Services division.[15]  Id. ¶¶ 10, 90.  Revenues and costs of

---

[15] The press release quoted Crain as stating:

Through the integration process, review of internal controls
and centralization of the financial reporting process the
Company has recently determined that the revenues and costs
of transportation for its International Services division
were overstated in like amounts because certain intercompany
transactions representing the buying and selling of
transportation services were not being appropriately
eliminated in consolidation within the division's legacy
accounting system. This had no impact on net revenues,

transportation had been overstated in offsetting amounts, about $26.8 million for the nine months ended September 30, 2003, and $16.9 million for the year ended December 31, 2002.  <u>Id.</u> ¶ 90. Stonepath stated there would be no impact on net revenues, EBITDA or net earnings.  <u>Id.</u>

During a December 31, 2003 conference call held to discuss the restatement and answer questions from analysts and investors, Pelino said:

> The duplication of gross revenues at our international division should not have happened in a perfect world but it did. We discovered it and we corrected it. We have also taken steps to ensure that this never happens again by working closely with our external and internal auditors to improve their due diligence and field testing methodologies.

<u>Id.</u> ¶ 91.

During the call, Crain stated:

> As part of our normal business process, we have audits done for all material transactions. As part of our public reporting process, we have our auditors do field work on a quarterly basis at each of our material business locations. Today that means we have people in the field every quarter in Minneapolis, Detroit, Seattle, and here in Philadelphia to make sure we're rolling up the right numbers. Also, as part of our public reporting process and the 302 certifications under Sarbanes-Oxley, we hold quarterly calls with the leadership of each of the business units and go through a rigorous series of questions to try to ferret

---

EBITDA or net earnings; however, the Company's transportation and net revenue margin percentages were understated.

<u>Id.</u> ¶ 90.

> out any areas of concern or weakness in our
> financial reporting processes. We also meet
> regularly with the leadership of management
> of the business units to review business
> results.

Id. ¶ 92.

Responding to a question by Andrew Ponzo, a private investor, about financial reporting by the acquired companies' senior management, Crain said that "a local senior financial executive reports in to the local CEO.  So specifically, Jim Hilgert reports to Jason Totah in Seattle, and Tim Anderson report[s] in to Joe DiGiacomo and Gary Koch in Minneapolis with a dotted line responsibility back to me."  Id. ¶ 93.  Pelino said:

> With respect to kind of the formality of the
> reporting, I think at the end of the day,
> people will have different views about where
> the dotted and solid line should be, but as
> long as the communication remains open and we
> have good candid conversations taking place,
> I think that can be made to work, and I do
> have the utmost confidence in the Jim
> Hilgert's and Tim Anderson's out there and
> their ability to do a good job for us.

Id.

Mr. Ponzo then said that he believed the same type of incident would not occur again, but asked "without having direct reporting into you or complete control over that, are there other instances that can happen, and if not [*sic*], how do we control that?"  Id. ¶ 94.  Pelino responded:

> [A]s I'm sure you're aware, Andrew, under
> Sarbanes-Oxley we're right now effectively
> identifying every material business process
> that exists across the business organization
> and will be going out and effectively
> benchmarking those practices against what are

deemed to be best practices under general
standards out there, and making sure that we
have state-of-the-art internal controls
across the entire organization. So through
this process to the extent that there are any
weaknesses they will be identified, and we'll
either change them or put other mitigating
processes in places to make sure that we
cover our basis [*sic*]. So I think we can all
take some comfort in getting our arms around
the universe of potential gotcha's and make
sure that we're focused on them.

Id.

On January 20, 2004, Stonepath filed a Form 10-K/A and
three Forms 10-Q/A, which restated Stonepath's financial results
by decreasing revenue and costs in like amounts for the year
ended December 31, 2002 and the three-month periods ended March
31, 2003, June 30, 2003, and September 30, 2003.  Id. ¶ 95.

On September 20, 2004, Stonepath announced the need for
a third Class Period restatement to revise its financial
statements for fiscal year 2003 and the first and second quarters
of 2004.  Id. ¶¶ 22, 271.  An internal review of the Domestic
Services unit revealed that its accrual process did not account
for the differences between estimated and actual purchased
transportation costs.  Id.  The under-accrual of actual costs was
estimated to be from $4.0 to $6.0 million for 2003 and from
$500,000 to $1.0 million for the first six months of 2004.  Id.
¶¶ 23, 271.  Stonepath stated that its reported EBITDA would be
reduced to the range of $2.6-$4.6 million for 2003 and $200,000-
$700,000 for the first six months of 2004.  Id. ¶ 271.

Stonepath's press release described the need for the

restatement as follows:

> In using its legacy operating system, to be
> replaced by Tech-Logis later this year,
> Domestic Services relied on trend analysis to
> estimate its costs of purchased
> transportation.  In reviewing the process by
> which Domestic Services maintained the
> accrual for its costs of purchased
> transportation, the Company has concluded
> that the process did not accurately account
> for the differences between the estimates and
> the actual freight costs incurred.  This
> allowed for the accumulation of previously
> unidentified costs of purchased
> transportation and an under reported
> liability for the accrued costs of purchased
> transportation.

Id. ¶ 272.

Furthermore, Pelino announced changes in management,
including that Jason Totah, the CEO of international operations,
would also become the CEO at Domestic Services, putting "all of
our logistics operations under one proven leader."  Id. ¶ 273.
Pelino described restructuring of financial and accounting
processes, including that "senior financial staff of [the]
Domestic Services and International Services operations [would]
report directly to Bohn Crain, the Company's Executive Vice
President and Chief Financial Officer."  Id.

The day of this announcement, on a trading volume of
4,830,200 shares, Stonepath stock closed at $0.86 per share, down
46% from the September 19, 2004 closing price of $1.59.  Id.
¶ 274.  The day after the announcement, and a day after the Class
Period ended, Stonepath held a conference call in which Pelino
and Crain participated.  Id. ¶ 275.  Plaintiffs allege that when
asked about Stonepath's discovery of the understatement of

14

transportation costs, "Crain stated that it would be fair to say that the Company discovered the issue in the last 30 days." Id. ¶ 277.

On January 6, 2005, Stonepath issued a press release concerning its financial results for the third quarter of 2004. In that release, Stonepath also stated that the estimated restatement figures announced in September would be increased, and would now extend back to 2001 and 2002:

> The Company expects to report an aggregate reduction in the previously reported net income for 2001 through the first six months of 2004 of approximately $16.3 million. Net income for 2001, 2002, 2003 and the first six months of 2004 is expected to be reduced by $0.4 million, $2.0 million, $7.8 million and $6.1 million, respectively.

Id. ¶ 281. As a result, the previously reported 2003 profit of $7.13 million would be replaced by a loss of $670,000. Id. For the first six months of 2004, the previously reported net loss of $785,000 would grow by $6.1 million. Id.

Also on January 6, 2005, Stonepath filed its quarterly report for the third quarter of 2004 on Form 10-K. Id. ¶ 282. It disclosed that the restatement announced on September 20, 2005 "resulted in technical default of certain financial covenants of [its credit] Facility." Id. However, the defaults were "waived" and Stonepath entered into an amended credit facility which, inter alia, reduced the amount of credit available from $25,000,000 to $22,500,000, established new minimum quarterly EBITDA targets, precluded acquisitions, and eliminated LIBOR-based borrowing. Id.

On February 11, 2005, Stonepath finally filed the restatement it had announced the previous September and then again in January 2005.  On a Form 10-K/A filed with the SEC, Stonepath restated its financial results for fiscal years 2001 through 2003.  The Form 10-K/A stated that since the September 21, 2004 announcement, Stonepath had analyzed its costs of purchased transportation and revenue transactions.  It found that:

> These errors resulted in an overstatement of revenues by $0.2 million in 2003, an understatement in purchased transportation costs by $4.4 million in 2003, $1.6 million in 2002, and $0.3 million in 2001 and an understatement of income tax expense of $2.0 million in 2003, $0.3 million in 2002 and $0.1 million in 2001.  These restatements also reduced goodwill by $4.3 million at December 31, 2003 and $1.3 million at December 31, 2002.  Net income was reduced by $7.9 million, including a reserve of $1.3 million related to excess earn-out payments in 2003, $1.9 million in 2002 and $0.3 million in 2001.

Id. ¶ 284.  This restatement did not change net income for the first and second quarters of 2004, which, according to the January 6, 2005 press release, is expected to be reduced by $6.1 million.  Id. ¶ 281.

On September 24, 2004, four days after Stonepath first announced its third restatement, Globis filed this suit against nominal defendant Stonepath and three of its current and former officers and directors, Dennis L. Pelino, Bohn H. Crain and L. Scully.  Pelino is the Chairman of the Board of Directors and served as Chief Executive Officer of Stonepath from June 21, 2001

through October of 2004.  Id. ¶ 34.  Crain was the Chief
Financial Officer from January 10, 2002, and Treasurer from May
30, 2002 through the end of the Class Period.  Id. ¶ 35.  Scully
is a certified public accountant who served as Vice-President and
Controller throughout the Class Period.  Id. ¶ 36.

The complaint states two counts.  Under Count I,
plaintiffs sue all defendants for violations of Section 10(b) of
the Exchange Act and Rule 10b-5 promulgated thereunder.  Under
Count II, plaintiffs sue the Individual Defendants for violation
of Section 20(a) of the Exchange Act.

Defendants seek dismissal, contending that plaintiffs
have failed to state a claim under either count.

Analysis

A.   Section 10(b) and Rule 10b-5

Count I of the amended complaint alleges that
defendants violated Section 10(b) of the Act and Rule 10b-5
promulgated thereunder.  Section 10(b) makes it illegal "[t]o use
or employ, in connection with the purchase or sale of any
security registered on a national securities exchange . . . any
manipulative or deceptive device or contrivance . . . ."  15
U.S.C. § 78j(b) (2003).  Rule 10b-5 provides an enforcement
mechanism for Section 10(b) by creating "a private cause of
action for investors harmed by materially false or misleading
statements."  In re Alpharma Inc. Sec. Litig., 372 F.3d 137, 147
(3d Cir. 2004).  Rule 10b-5 "makes it unlawful for any person
'[t]o make any untrue statement of a material fact or to omit to

17

state a material fact necessary to make the statements made in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security.'" In re IKON Office Solutions, Inc., 277 F.3d 658, 666 (3d Cir. 2002) (quoting 17 C.F.R. § 240.10b-5(b)).

Our Court of Appeals has instructed that, to state a valid claim for a violation of Section 10(b) and Rule 10b-5, a plaintiff must show that "the defendant (1) made a misstatement or an omission of a material fact (2) with scienter (3) in connection with the purchase or the sale of a security (4) upon which the plaintiff reasonably relied and (5) that the plaintiff's reliance was the proximate cause of his or her injury." In re IKON, 277 F.3d at 666; see also Sowell v. Butcher & Singer, Inc., 926 F.2d 289, 296 (3d Cir. 1991) (collapsing the first and third elements).

Plaintiffs' securities fraud claim is also subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA") § 101(b), Pub. L. No. 104-67, 109 Stat. 737, 743 (codified at 15 U.S.C. § 78u-4 (2004)).  Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." See also In re Westinghouse Sec. Litig., 90 F.3d 696, 710 (3d Cir. 1996) (explaining that Section 10(b) claims must comply with Rule 9(b)); Denny v. Barber, 576 F.2d 465, 470 n.4 (2d Cir. 1978) (suggesting that Rule 9(b) applies to Section

18

18 claims); <u>McHale v. NuEnergy Group</u>, No. 01-4111, 2002 WL
321797, at *3 (E.D. Pa. Feb. 27, 2002) (Giles, C.J.) (discussing
applicability of Rule 9(b) to common law fraud claim); <u>but see</u>
<u>In re U.S. Interactive, Inc. Sec. Litig.</u>, No. 01-522, 2002 WL
1971252, at *20 (E.D. Pa. Aug. 23, 2002) (Giles, C.J.) (holding
that "heightened pleading requirements of Rule 9(b) do not apply
to claims under Section 20(a)").  Our Court of Appeals has
further explained that "Rule 9(b) requires, at a minimum, that
plaintiffs support their allegations of securities fraud with all
of the essential factual background that would accompany 'the
first paragraph of any newspaper story'--that is, the 'who, what,
when, where and how' of the events at issue." <u>In re Rockefeller</u>
<u>Ctr. Props., Inc. Sec. Litig.</u>, 311 F.3d 198, 217 (3d Cir. 2002)
(quoting <u>In re Burlington Coat Factory</u>, 114 F.3d at 1422).

       The PSLRA imposes an additional "layer of factual
particularity" for pleadings.  <u>In re Rockefeller</u>, 311 F.3d at
217.  It requires a plaintiff who alleges that a defendant made
an untrue statement of material fact to "specify each statement
alleged to have been misleading [and] the reason or reasons why
the statement is misleading." 15 U.S.C. § 78u-4(b)(1) (2004).
Moreover, when the plaintiff must prove that the defendant acted
with a particular state of mind, the complaint must "state with
particularity facts giving rise to a strong inference that the
defendant acted with the required state of mind." 15 U.S.C. §
78u-4(b)(2) (2004); <u>see In re Advanta Corp. Sec. Litig.</u>, 180 F.3d
525, 530-35 (3d Cir. 1999) (discussing how PSLRA modified

pleading requirements in securities fraud cases).

Plaintiffs here allege that the defendants used public statements and SEC filings throughout the Class Period to "portray[] Stonepath as an increasingly profitable company positioned to expand and continue earnings growth through strategic acquisitions," but that they "knew, or recklessly disregarded that Stonepath was plagued by internal control deficiencies that caused the Company to consistently understate its most significant operating cost." Compl. ¶ 2. Plaintiffs contend that "financial benchmarks cited by Defendants as the most useful measures of the Company's performance were materially overstated" and that "earnings estimates, which were based on Stonepath's past financial performance, had no reasonable basis because the financial assumptions upon which they were based included the materially overstated Class Period earnings." Id. Plaintiffs also allege that Stonepath represented that its financial statements were prepared in compliance with generally accepted accounting principles ("GAAP"), which was materially false and misleading. Id. ¶ 9. Instead of "being a profitable growth company," restatements revealed that "Stonepath was, in fact, a company with a greater than reported loss for 2001, minimal earnings for 2002, and no earnings for 2002 through the first six months of 2004." Id. ¶ 2.

Plaintiffs assert that defendants delayed disclosing Domestic Services' understatement of costs in order to (1) artificially maintain Stonepath's reported EBITDA, thereby

20

remaining in compliance with the terms of its credit facility, id. ¶ 311, and (2) artificially maintain the value of Stonepath's stock, which is said to have reduced the costs of an acquisition that was partly paid with it, id. ¶ 321.  Credit was purportedly needed because of liquidity problems arising from, inter alia, "earn-out" payments due to sellers of acquired companies when those companies reached certain targets and costs incurred in implementing the Tech-Logis system.  Id. ¶¶ 313-14.  The disclosure of Domestic Services' understated transportation costs caused Stonepath to breach the EBITDA ratio covenant of its credit facility.  Id. ¶ 312.  As a result, Stonepath's lender has now precluded it from making further acquisitions, which is said to be Stonepath's "primary strategic objective."  Id. ¶ 2.

Plaintiffs' complaint identifies the allegedly materially false and misleading statements by quoting from Stonepath press releases, SEC filings and conference calls, alleging in each instance that defendants knew or recklessly disregarded that the statements made were materially false and misleading.  Id. ¶¶ 96-270.  Plaintiffs attribute each of the statements to one or all of the Individual Defendants, identify what was said and when it said, and explain why the statement was false or misleading.

Defendants, in their motion to dismiss, portray this as a strike suit and argue that plaintiffs have failed to plead specific factual allegations, as Rule 9(b) and the PSLRA require. Defendants' motion focuses solely on the second of the five Rule

21

10b-5 elements, scienter, so we now address that element.

1.  Scienter

Plaintiffs must plead scienter adequately if their complaint is to survive a motion to dismiss.  See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193, 96 S. Ct. 1375, 1381 & n.12 (1976).  Scienter, in the context of securities fraud, is:

> a mental state embracing intent to deceive,
> manipulate or defraud, or, at a minimum,
> highly unreasonable (conduct), involving not
> merely simple, or even inexcusable
> negligence, but an extreme departure from the
> standards of ordinary care, . . . which
> presents a danger of misleading buyers or
> sellers that is either known to the defendant
> or is so obvious that the actor must have
> been aware of it.

In re IKON, 277 F.3d at 667 (citations and internal quotations omitted).

Conclusory allegations will not do under this jurisprudence.  "[A]llegations that a securities-fraud defendant, because of his position within the company, 'must have known' a statement was false or misleading are 'precisely the types of inferences which [courts], on numerous occasions, have determined to be inadequate to withstand Rule 9(b) scrutiny.'"  In re Advanta Corp. Sec. Litig., 180 F.3d 525, 539 (3d Cir. 1999) (quoting Maldonado v. Dominguez, 137 F.3d 1, 10 (1st Cir. 1998)); cf. In re Aetna Inc. Sec. Litig., 34 F.Supp.2d at 953 (explaining that Advanta did not address scienter where corporation's core business activities were at issue).  Most pertinently here, "claims essentially grounded on corporate mismanagement are not

cognizable under federal law." In re Advanta, 180 F.3d at 540
(quoting Craftmatic Sec. Litig. v. Kraftsow, 890 F.2d 626, 638-39
(3d Cir. 1989)).  It is not enough for plaintiffs to "allege
generally that defendants knew or recklessly disregarded each of
the false and misleading statements for which [they were] sued,"
but rather "plaintiffs must allege facts that could give rise to
a 'strong' inference of scienter." In re Burlington, 114 F.3d at
1422 (citation and internal quotation omitted).  Interpreting the
"strong inference" requirement, our Court of Appeals has
explained that "[p]laintiffs must either (1) identify
circumstances indicating conscious or reckless behavior by
defendants or (2) allege facts showing both a motive and a clear
opportunity for committing the fraud." Id.; see also In re
Advanta, 180 F.3d at 534-35 (discussing standards for pleading
scienter in light of PSLRA).

     A reckless statement involves "not merely simple, or
even inexcusable negligence, but an extreme departure from the
standards of ordinary care, and which presents a danger of
misleading buyers or sellers that is either known to the
defendant or is so obvious that the actor must have been aware of
it." In re Advanta, 180 F.3d at 535 (quoting McLean v.
Alexander, 599 F.2d 1190, 1197 (3d Cir. 1979) (citations and
internal quotations omitted).  Allowing scienter to be
established through recklessness "promotes the policy objectives
of discouraging deliberate ignorance and preventing defendants
from escaping liability solely because of the difficulty of

23

proving conscious intent to commit fraud."  Id.  For conscious behavior, "scienter may be alleged by stating with particularity facts giving rise to a strong inference of conscious wrongdoing, such as intentional fraud or other deliberate illegal behavior."  Id.

Motive and opportunity "must now be supported by facts stated 'with particularity' and must give rise to a 'strong inference' of scienter."  Id. (quoting 15 U.S.C.A. § 78u-4(b)(2). "Catch-all allegations that defendants stood to benefit from wrongdoing and had the opportunity to implement a fraudulent scheme are no longer sufficient."  Id.

Plaintiffs contend that the defendants were reckless and that they had motive and opportunity to commit fraud.  We now address each argument.

## 2.  Recklessness

Plaintiffs assert that the allegations in their complaint, when viewed together, raise a strong inference of defendants' recklessness.  Plaintiffs highlight five points:  (1) defendants violated their duty to monitor and report a core part of Stonepath's business, transportation costs; (2) the three restatements during the Class Period are probative of scienter; (3) the restatement of September 29, 2004 was very large; (4) the restatements occurred over two and a half years; and (5) regular reports to defendants kept them informed about internal control problems.  Because plaintiffs' second, third and fourth points involve the restatements, we address those first, and then turn

to plaintiffs' first and last points.

Plaintiffs claim that the size of Stonepath's third restatement supports a strong inference of scienter.  In this circuit, district courts have found magnitude relevant when viewed together with other factors.  See In re Rent-Way Securities Litigation, 209 F.Supp.2d 493, 506 (W.D. Pa. 2002) ("In and of itself, the magnitude of an erroneous financial statement is insufficient to raise a strong inference that a defendant acted with scienter."); P. Schoenfeld Asset Management LLC v. Cendant Corp., 142 F.Supp.2d 589, 609 (D.N.J. 2001) (strong inference of scienter established by allegations of "hundreds of fraudulent accounting entries, in combination with the sheer magnitude of the revenue and earnings overstatements, as well as [other] 'red flags'").

Defendants do not dispute the magnitude of the third restatement, which Stonepath issued because of Domestic Services' under-accrual of transportation costs.  When the restatement was formally made on February 11, 2005, it eliminated $7.1 million in net income for 2003 and replaced it with a loss.  Compl. ¶ 26. Also in that restatement, net revenues for 2001 and 2002 were decreased, net loss for 2001 was increased, and net income for 2002 was decreased.  Id. ¶ 27.  While the September 2004 press release announced that the first and second quarters of 2004 would be restated, id. ¶ 271, this has yet to happen.  We know from the January 6, 2005 press release that net income for that period is expected to be reduced by $6.1 million.  Id. ¶ 281.

25

The third restatement not only materially changed earnings statements, but it also indisputably prompted sales of stock that reduced stock value, reduced the amount of credit available and precluded further acquisitions.  The magnitude of the restatement is undeniably large, and therefore relevant, but alone it does not establish recklessness.

Plaintiffs also assert that repeated restatements are probative of scienter, and that the second restatement was a "'red flag' to Defendants that [legacy information] systems were inherently unreliable and generating inaccurate financial data." Id. ¶ 305.  "When plaintiffs 'allege the existence of specific facts that should put defendants on notice of errors in recognizing revenue or indicate reasons to question management's representations,' a refusal to react to these 'red flags' can support a strong inference of scienter."  In re Rent-Way Sec. Litig., 209 F.Supp.2d 493, 508-509 (W.D. Pa. 2002) (quoting In re SCB Computer Technology, Inc. Sec. Litig., 149 F.Supp.2d 334, 363 (W.D.Tenn. 2001)).

Defendants argue that repeated restatements do not here suggest scienter since each restatement responded to issues that were different in kind.  The first restatement concerned allocating value to intangible assets for acquired companies and revising the amortization method and useful life assumed for such assets.  The second restatement involved duplication of gross revenues at the International Services division.  The third restatement concerned Domestic Services' under-accrual of

26

transportation costs.  Since the restatements addressed such
unrelated problems, it cannot be said that the mere fact that
there were three restatements shows defendants acted recklessly.

Plaintiffs offer no facts suggesting that problems with
under-accrual of transportation costs were revealed when
Stonepath identified the duplication error, so we cannot say
defendants had a "red flag" as to that problem.  However,
Pelino's and Crain's comments during the December 31, 2003
conference call reveal that they were aware there might be
further risks in Stonepath's financial reporting processes.
Pelino and Crain reassured analysts and investors they were
working closely with auditors.  Compl. ¶ 91-92.  Crain stated
that they were identifying steps "to reduce, if not eliminate,
any remaining risk in our financial reporting processes."  Id.
¶ 92.  Pelino also stated that they were "identifying every
material business process" to ensure there were "state-of-the-art
internal controls across the entire organization."  Id. ¶ 94.
Significantly, plaintiffs do not allege that either internal or
external auditors or any participant in the comprehensive review
process alerted defendants to the problems leading to the third
restatement.

Plaintiffs instead rely on the reporting process Crain
described in the December 31, 2003 conference call.  Id. ¶ 91.
Crain had told analysts and investors that Tim Anderson reported
to Joe DiGiacomo and Gary Koch, the men who reported to Crain.
Id. ¶ 93.  By early January of 2004 at the latest, Tim Anderson

27

knew Domestic Services had serious financial reporting problems, id. ¶ 67, but not until nine months later (on September 20, 2004) did defendants reveal that Domestic Services had been greatly under-accruing transportation costs, id. ¶ 271.  On the September 21, 2004 conference call, Crain allegedly stated that Stonepath discovered the problem in the last thirty days.  Id. ¶ 177.  Plaintiffs state that "[a]ccording to another former employee, Anderson reported the issue to someone in senior management at Stonepath, believed to be Crain, and that individual 'sat on' the information."  Id. ¶ 277.

Defendants argue that plaintiffs never adequately allege that Anderson forwarded this information to defendants. Defendants are correct that plaintiffs' statement, which fails to identify the "former employee" with any particularity, cannot pass 9(b) or PSLRA muster.  Plaintiffs simply have not provided the requisite particularized facts showing that the information about under-accrual -- or, for that matter, any of the alleged accounting and financial reporting problems described by their confidential witnesses -- reached defendants well before Stonepath's restatements.

Finally, plaintiffs argue that knowledge of activities central to Stonepath's business -- namely, transportation costs -- can be imputed to the Individual Defendants.  Defendants concede that high-level officers can be charged with knowing information about a company's core business, though they contend, without citing any authority in this circuit, that this rule

28

generally applies when facts at issue are readily discoverable and directly affect the company.

Our courts have repeatedly held that knowledge of core activities can be imputed to high-level officers. See In re Campbell Soup Co. Sec. Litig., 145 F.Supp.2d 574, 599 (D.N.J. 2001) ("While asserting that defendants approved or helped prepare public disclosures is insufficient to establish knowledge of all aspects of the company's business, knowledge may be imputed to [officers of the company] when the [public] disclosures involve the company's core business") (citations omitted); In re Aetna Inc. Sec. Litig., 34 F.Supp.2d 935, 953 (E.D. Pa. 1999) (finding allegations of CEO's and CFO's scienter sufficient where the alleged fraud related to the company's core business); In re Viropharma, Inc., Sec. Litig., No. 02-1627, 2003 WL 1824914, at *9 (E.D. Pa. Apr. 7, 2003) (knowledge of facts could be imputed to "the highest ranking members of the company" because a drug was the company's "leading product"). These cases do not hold that facts must be easily discoverable, as defendants contend, although by their nature core activities can be said to directly affect the corporation.

Plaintiffs cite to Stonepath's 2002 10-K/A and 2003 10-K to show the significance of transportation costs:

> Our cost of transportation includes direct costs of transportation, including motor carrier, air, ocean and rail services. We act principally as the service provider to add value in the execution and procurement of these services to our customers. Our **net transportation revenues** (gross transportation

> revenues less the direct cost of
> transportation) are the **primary indicator** of
> our ability to source, add value and resell
> services provided by third parties, and are
> considered by management to be a **key
> performance measure**. Management believes that
> **net revenues** are also an **important measure of
> economic performance**. Net revenues include
> transportation revenues and our fee-based
> activities, after giving effect to the cost
> of purchased transportation.

Compl. ¶ 63 (emphasis added).

Plaintiffs further allege that transportation costs were Stonepath's "single largest expense," and that because of their importance, they were reported separately from on-going operating expenses. Id. ¶ 303. Plaintiffs do not break down all Stonepath's expenses, but they do state that Stonepath reported the following figures, which we place in a table for ease of reference:

|  | 2002 | 2003 |
|---|---|---|
| Transportation revenues | $ 113,510,000[16] | $ 203,407,000[17] |
| Transportation costs | $ 84,478,000 | $ 153,718,000 |
| Net transportation revenues | $ 29,032,000 | $ 42,689,000 |
| Net income | $ 2,380,000 | $ 7,139,000 |

Id. ¶ 225.

Based on these asserted facts, plaintiffs claim that Domestic Services' transportation costs and the reporting process

---

[16] Plaintiffs' figure in their complaint is "$ 113,510." Id. ¶ 225. We assume plaintiffs meant $113,510,000.

[17] Plaintiffs' figure is "$203,407,00." Id. ¶ 225. We again assume this was a typographical error and that plaintiffs meant to include an additional zero at the end.

30

for such costs were a "critical component of [Stonepath's] core business" and that defendants "had a duty to monitor the accuracy" of these costs and reporting processes.  Id. ¶ 303.

Defendants do not contradict the importance of transportation costs.  Instead, they assert that knowledge cannot be imputed to defendants merely because defendants' subordinates may have known of alleged accounting irregularities.  For this proposition, defendants rely on In re Alpharma Inc. Securities Litigation, 372 F.3d 137 (3d Cir. 2004), a securities fraud class action brought against a multinational pharmaceutical company. While Alpharma supports defendants' proposition as stated, see id. at 150, a closer examination of that case is instructive.

In Alpharma, employees in the Brazil division of Alpharma's Animal Health Division ("AHD") allegedly used improper accounting methods to increase revenue figures, which in turn affected Alpharma's net income.  In finding that plaintiffs did not adequately plead that defendants knew about the accounting irregularities, the court noted the complaint was "devoid of any allegations" that AHD's Brazil division was "so central to Alpharma's business" that company executives should have noticed the Brazil division's increased reported revenues.  Id. at 151. It further noted that "the Brazil division's *total* revenue accounted for only slightly more than one half of one percent of the company's total revenue in 1999."  Id. (emphasis in original).

Here, we can surmise that Domestic Services is not as

remote a subsidiary as the one in <u>Alpharma</u>, though the complaint does not provide particularized facts about the role various subsidiaries played within Stonepath.  To be sure, plaintiffs have adequately pled that transportation revenues are central to Stonepath's business by providing statements from SEC filings and figures to support that claim.  However, plaintiffs must do something more:  they must show that Domestic Services' transportation costs are at the core of Stonepath's business.

We know from the figures provided that transportation costs are a very large, if not the largest, expense for Stonepath.  What we do not know is how Domestic Services fits into the picture.  To illustrate, transportation costs for 2003 were $153,718,000, and for 2002 they were $84,478,000.  According to the third restatement, transportation costs were understated by $4.4 million for 2003 and $1.6 for 2002, <u>i.e.</u>, less than 2.9% of transportation costs for 2003 and 1.9% in 2002.  <u>Alpharma</u> teaches that courts must look to the numbers involved and decide whether their magnitude should have alerted defendants to accounting improprieties.  At variances of 2.9% and 1.9%, plaintiffs have not shown that the costs Domestic Services reported for the restated years were of such size that defendants should have been suspicious.  Plaintiffs have, in short, failed to sufficiently plead that transportation costs at Domestic Services are so central to Stonepath's business that knowledge of financial reporting and accounting problems could be imputed to defendants.

In sum, the complaint alleges various accounting and financial reporting problems within Stonepath, and it reveals the effects of a large third Class Period restatement.  It does not, however, allege facts showing that defendants had knowledge of or recklessly disregarded information about the alleged problems and intentionally concealed those problems from investors.  We find that plaintiffs have failed to provide sufficiently particularized facts that would support the conclusion that defendants behaved recklessly.

### 3.   Motive and Opportunity

Because the Individual Defendants served as Stonepath's senior officers and/or directors, their opportunity to control the dissemination of information about Stonepath is undisputed. The parties dispute whether the motives alleged are sufficient. Plaintiffs rely primarily on two alleged motivations: (1) to inflate Stonepath stock to use it in various acquisitions, and (2) to inflate EBITDA to comply with Stonepath's debt covenants. Defendants assert that both motivations are insufficient as a matter of law.

Plaintiffs rely mainly on one acquisition to establish motive under their first theory.  On February 9, 2004, Stonepath acquired 55% of Shaanxi Sunshine Cargo Services International Co., Ltd. ("Shaanxi") for $3.5 million in cash and $2 million in stock.  Compl. ¶ 21.  Defendants point to further relevant information in the Form 8-K filed on February 9, 2004, which shows that, in addition to the $5.5 million paid at closing:

33

> The Company has agreed to issue additional
> shares of its common stock to Mr. Tsai if at
> the end of the one year restrictive period,
> the Company's common shares are trading at a
> price of less than $3.17 per share.  The
> Company also agreed to an earn-out
> arrangement over a period of five (5) years
> of up to $5.5 million ($1.1 million per year)
> contingent upon Shaanxi realizing pre-tax net
> income of at least $4 million per year during
> the earn-out period.  As additional purchase
> price, on a post-closing basis, the Company
> has also agreed to pay for excess closing
> date working capital estimated at between $1
> and $2 million.

Defs.' Mot. to Dismiss, Ex. J.[18]  Therefore, the deal was worth up to $13 million dollars, and stock was $2 million of that.

Our Court of Appeals has instructed that "[m]otives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a *concrete and personal benefit* to the individual defendants resulting from this fraud."  GSC Partners CDO Fund v. Washington, 368 F.3d 228, 237 (3d Cir.) (emphasis added) (quoting Kalnit v. Eichler, 264 F.3d 131, 139 (2d Cir. 2001)).  In GSC Partners, a company's acquisition was primarily financed by a $300 million note offering, and, to acquire the company, the defendant allegedly committed fraud by concealing the company's true financial condition in the note offering.  368 F.3d at 235, 237. Plaintiffs alleged that the notes would not have sold at or near the price sought if the company's true financial condition had been revealed.  Id.  The court found that allegation insufficient

---

[18] Under Oran v. Stafford, 226 F.3d 275, 289 (3d Cir. 2000), the court can take judicial notice of SEC filings.

and explained that a corporation and its directors have a desire
to complete all corporate transactions, and typically officers
benefit financially from successful transactions.  Id. at 237.
The court made clear that "such allegations alone cannot give
rise to a 'strong inference' of fraudulent intent," and cited a
number of cases to illustrate this proposition, including Herzog
v. GT Interactive Software Corp., 98 Civ. 0085, 1999 WL 1072500,
at *9 (S.D.N.Y. Nov. 29, 1999), which held that "a defendant's
'desire to consummate [a] corporate transaction does not
constitute a motive for securities fraud.'"  368 F.3d at 237-38.

        In another case decided less than a month after GSC
Partners, our Court of Appeals found that plaintiffs had not
established motive where they pled that defendant benefitted from
selling shares at prices allegedly inflated by defendants' false
and misleading statements.  In re Alpharma Inc. Sec. Litig., 372
F.3d 137, 152-53.  The court approvingly cited a case from the
Ninth Circuit, In re Vantive Corp. Sec. Litig., 283 F.3d 1079,
1097 (9th Cir. 2002), which concluded "that a corporation's
desire to increase its stock value as part of an acquisition
strategy is an insufficient basis upon which to maintain a claim
for violation of federal securities laws."  372 F.3d at 153.

        Plaintiffs here have alleged that defendants
artificially maintained high stock prices to complete an
acquisition.  This is hardly the "concrete and personal benefit"
that GSC Partners had in mind.  Since this is precisely the type
of motive that our Court of Appeals deemed insufficient in GSC

<u>Partners</u> and <u>Alpharma</u>, we find that under this theory plaintiffs have not established scienter.

To support their second motive theory, plaintiffs contend that Stonepath needed access for on-going working capital, in part because costs associated with implementing Tech-Logis increased from $0.2 million in 2002 to $3.2 million in 2003.  Compl. ¶ 314.  Also, Stonepath's rapid acquisitions had caused increasing liquidity problems, evidenced by its difficulties paying vendors and carriers on time.  Therefore, defendants, in need of working capital, were allegedly motivated to delay or avoid disclosing Domestic Services' understated transportation costs since that would result in the breach of Stonepath's credit facility's EBITDA ratio covenant.  In fact, the disclosure made in the third restatement did breach that covenant, but lenders waived the breach and renegotiated the terms, decreasing available credit, shortening the repayment period, and prohibiting acquisitions.  <u>Id.</u> ¶ 320.

Defendants argue that maintaining access to credit is a generalized corporate motive that does not raise a strong inference of scienter.

In <u>GSC Partners</u>, the court approvingly cited <u>San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.</u>, 75 F.3d 801, 813-14 (2d Cir.1996), and noted that the Second Circuit found "that a 'company's desire to maintain a high bond or credit rating' [was] insufficient motive for fraud because such motive could be imputed to any company."  368 F.3d

at 238.  That reasoning applies where plaintiffs allege that
defendants were motivated by a desire to comply with debt
covenants.  See Wilson v. Bernstock, 195 F.Supp.2d 619, 637
(D.N.J. 2002) (explaining that a company's desire to maintain a
high credit rating is insufficient motive for fraud and applying
the same reasoning where defendants were allegedly motivated to
commit fraud to comply with a debt covenant).  At most, the need
to comply with debt covenants can be a contributing motive to
commit securities fraud, but standing alone even severe cash flow
problems are insufficient to establish motive.  See In re Loewen
Group Inc. Sec. Litig., No. 98-6740, 2004 WL 1853137, at *21
(E.D. Pa. Aug. 18, 2004).  Otherwise, any corporation that was
subject to debt covenants and whose stock price declined would be
susceptible to a securities fraud action.  Id.  In short, wanting
good credit ratings proves too much to serve as a scienter
motive; it most assuredly cannot be a requisite "concrete and
personal benefit."

        In sum, plaintiffs have here alleged the type of
generalized motive regarding access to credit that is
insufficient to support scienter.  Neither of plaintiffs' motive
theories go beyond "[m]otives that are generally possessed by
most corporate directors and officers" and neither "assert a
concrete and personal benefit to the individual defendants
resulting from this fraud."  GSC Partners, 368 F.3d at 237 (3d
Cir.) (emphasis added) (quoting Kalnit v. Eichler, 264 F.3d 131,
139 (2d Cir.)).  Plaintiffs have, therefore, not established

scienter under a motive and opportunity theory.

      B.   <u>Section 20(a)</u>

      In Count II, the complaint alleges that the defendants violated Section 20(a) of the Act, 15 U.S.C. § 78t(a) (2004). That section imposes joint and several liability on one who controls a corporation that violates federal securities laws. The defendants suggest that we should dismiss this claim because plaintiffs failed to plead their other federal claim adequately and a Section 20(a) claim will not lie when there are no actionable independent underlying violations of the Act.  <u>See</u> <u>In re Advanta Corp. Sec. Litig.</u>, 180 F.3d at 541; <u>see also</u> <u>In re Rockefeller Center Properties, Inc.</u>, 311 F.3d 198, 211 (3d Cir. 2002) ("[I]t is well-settled that controlling person liability is premised on an independent violation of the federal securities laws.").

      Because we read the allegations in the complaint as insufficient to state a claim for violation of Sections 10(b) of the Act for purposes of this motion to dismiss, we shall dismiss the Section 20(a) claim.

<u>Conclusion</u>

      Plaintiffs have failed to allege particularized facts that create a strong inference that defendants acted with scienter.  Therefore, we grant defendants' motion to dismiss.

      Because leave to amend a complaint "shall be freely given when justice so requires," Fed. R. Civ. P. 15(a), and

because we are "hesitant to preclude the prosecution of a possibly meritorious claim because of defects in the pleadings," In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1435 (3d Cir. 1997), we also grant plaintiffs leave to amend their complaint if they can do so conformably with the foregoing analysis and with Fed. R. Civ. P. 11.

      An appropriate Order follows.