IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE STONEPATH GROUP, INC.      :      CIVIL ACTION
SECURITIES LITIGATION            :
                                 :
                                 :
                                 :      NO. 04-4515

MEMORANDUM

Dalzell, J.                                      April 3, 2006

        This consolidated litigation is a putative class action
brought on behalf of those who purchased Stonepath Group, Inc.
securities between March 29, 2002 and September 20, 2004 (the
claimed "Class Period").  Lead plaintiff Globis Capital Partners,
L.P.,[1] here sues nominal defendant Stonepath and three of its
current and former officers, Dennis L. Pelino (also a director),
Bohn H. Crain and Thomas L. Scully (collectively the "Individual
Defendants") for violations of the Securities Exchange Act of
1934.  Before us now is defendants' motion to dismiss plaintiffs'
second amended consolidated class action complaint, which largely
challenges whether plaintiffs have sufficiently pleaded the
requisite scienter.[2]

_____

        [1] On November 8, 2004, upon stipulation of the parties
and pursuant to Fed. R. Civ. P. 42(a), we consolidated Civil
Action Numbers 04-4515, 04-4634, 04-4646, 04-4650, 04-4666, 04-
4670, and 04-4674 under the above civil action number.  Two weeks
later, we further consolidated Civil Action Nos. 04-4515 and 04-
5390.  We appointed Globis Capital Partners, L.P. as lead
plaintiff in this case and approved its selection of lead class
counsel on January 18, 2005.  Because Globis represents all
plaintiffs who have been consolidated into this action, we use
"plaintiffs" when referring to Globis's contentions in the motion
considered here.

        [2] The Court may grant a motion to dismiss under Rule
12(b)(6) "only if, accepting all well pleaded allegations in the
complaint as true, and viewing them in the light most favorable
to plaintiff, plaintiff is not entitled to relief."  In re
(continued...)

I.   Factual Background

On October 27, 2005, we dismissed plaintiffs' first amended consolidated class action complaint and permitted them to file a second amended complaint, which they did on November 15, 2005.  See In re Stonepath Group, Inc. Sec. Litig., 397 F.Supp.2d 575, 578-80 (E.D. Pa. 2005).  While many of the alleged facts remain unchanged, plaintiffs have added some new allegations, the most relevant being those concerning Stonepath's subsidiary, Stonepath Logistics Domestic Services, Inc., that subsidiary's CEO, Gary Koch, and its Air Plus division.[3]  We therefore revisit the events giving rise to this action and incorporate the new allegations.

Stonepath is a Delaware corporation with a principal place of business in Pennsylvania.  Second Am. Consol. Class

_____

[2](...continued)
Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1420 (3d Cir. 1997).  "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).  In other words, we will not grant such a motion "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Conley v. Gibson, 355 U.S. 41, 45-46 (1957); see also Semerenko v. Cendant Corp., 223 F.3d 165, 173 (3d Cir. 2000) (permitting dismissal "only if it appears that the [plaintiffs] could prove no set of facts that would entitle [them] to relief").  "The complaint will be deemed to have alleged sufficient facts if it adequately put the defendants on notice of the essential elements of the plaintiffs' cause of action."  Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996).  We shall review factual background for plaintiffs' claims with these principles in mind.

[3] Our task in identifying the differences was greatly simplified by the red-lined version of the second amended complaint that plaintiffs submitted.  We are most grateful for this professional courtesy, which was of considerable help as we reviewed the 132-page second amended complaint.

Action Compl. ("Second Am. Compl.") ¶ 38.  In early 2001, Stonepath changed from a company focused on "developing early-stage technology businesses with significant Internet features" to one that "deliver[ed] non-asset based third-party logistics services."  Id. ¶ 2.  To effectuate this transition, Stonepath bought "numerous" operating businesses in the transportation and logistics sector, beginning in the second quarter of 2001.  Id. ¶¶ 3, 58.

A.  The Acquisitions

Plaintiffs allege that Stonepath's "most significant acquisition[]" took place on October 5, 2001, when it acquired a group of Minneapolis-based privately held companies -- M.G.R., Inc. (d/b/a Air Plus Limited), Distribution Services, Inc., and Contract Air, Inc. (collectively "Air Plus").  Id. ¶¶ 58, 60.  Air Plus was a "platform acquisition," that is, an acquisition "that creates a significant new capability for the Company, or entry into a new global geography."  Id. ¶ 3.  According to Stonepath's Form 10-K for the year ended December 31, 2001, Stonepath paid $17.5 million in cash at closing and agreed to a $17 million "four-year earn-out arrangement based on the future financial performance of Air Plus."  Id. ¶ 59.  Stonepath stated that it:

> agreed to pay the former Air Plus shareholders installments of $3.0 million in 2003,[4] $5.0 million in 2004, $5.0 million in

---

[4] Stonepath explained in its Form 10-Q for the period ended September 30, 2002 that "the 2003 installment will be based on pre-tax income of $6.0 million achieved during the 15 month
(continued...)

> 2005 and $4.0 million in 2006, each
> installment payable in full if Air Plus
> achieves pre-tax net income of $6.0 million
> in each of the years preceding the year of
> payment. In the event there is a shortfall in
> pre-tax net income, the earn-out payment will
> be reduced on a dollar-for-dollar basis to
> the extent of the shortfall. Shortfalls may
> be carried over or carried back to the extent
> that pre-tax net income in any other pay-out
> year exceeds the $6.0 million level.

Id. (footnote added). Stonepath's October 5, 2001 Form 8-K stated that the earn-out payments went only to MGR shareholders, and it identified Gary A. Koch as a majority shareholder of MGR and Contract Air, Inc., as well as the sole shareholder of Distribution Services, Inc. Id. ¶ 60. After the acquisition, Koch became the CEO of Air Plus and of Stonepath's domestic operation, Stonepath Logistics Domestic Services, Inc. ("Domestic Services"). Id. ¶¶ 3, 61.

Plaintiffs, drawing from Stonepath's public filings with the Securities and Exchange Commission, allege that Air Plus's earnings were key to Stonepath's profitability. We have consolidated plaintiffs' data in a table:

|      | Stonepath's reported financial results for continuing operations without Air Plus earnings | Air Plus earnings | Stonepath's reported financial results for continuing operations with Air Plus earnings |
|------|------|------|------|
| 2001 | ($ 4,694,000) | $ 1,700,000 | ($ 2,994,000) |
| 2002 | ($ 1,034,000) | $ 4,600,000 | $ 3,566,000 |
| 2003 | $    902,000 | $ 6,500,000 | $ 7,402,000 |

Id. ¶¶ 322-32.

---

[4](...continued)
period from October 1, 2001 through December 31, 2002." Second Am. Compl. ¶ 326.

By reporting earnings of $6.3 million from October 1, 2001 through December 31, 2002 and of $6.5 million in 2003, Air Plus met the earnings targets that triggered full payment of the first two of the four possible earn-out payments.  Accordingly, its former shareholders, including its majority shareholder, Koch, were entitled to receive $3 million in 2003 and $5 million in 2004.

On May 30, 2002, Stonepath augmented Domestic Services by acquiring American United, "a Detroit-based privately held provider of expedited transportation services." Id. ¶ 64.  It paid $5.1 million in cash at closing, and $11 million to "the former United American shareholder" in a "four-year earn-out arrangement based upon the future financial performance of United American." Id.

Plaintiffs give some context for understanding Domestic Services' role within Stonepath.  Allegedly, "at the end of the Class Period, Defendant Pelino responded to an analyst's question concerning the effect of the misstated transportation costs on [2004] guidance" by stating that "within our existing guidance of $9 to $11 million, domestic's contribution to that was approximately 5 million."[5]  Id. ¶ 318.  Thus, it seems that

---

[5] Plaintiffs actually state "transportation costs on 2005 guidance." Id. ¶ 318 (emphasis added).  However, earlier in the second amended complaint, they allege that during an August 5, 2004 conference call, Pelino stated that:

> Over the near-term, we're seeing more cost and revenues that will initially project about 2004. It is this dynamic, which leads us to re-express our 2004 EBITDA guidance in
>                                        (continued...)

Domestic Services was expected to be responsible for about half of Stonepath's projected 2004 earnings.

Stonepath's acquired companies had disparate pre-existing, or legacy, information systems, as well as their own operating policies and procedures.  Id. ¶ 66.  Stonepath stated that it was evaluating "technologies obtained through our acquisition strategy" and "commercially available supply chain technologies" to create its own "best-of-breed" solution, called Technology in Logistics or Tech-Logis℠.  Id.  But while developing Tech-Logis℠ and working toward an "ultimate migration" of the acquired companies' information systems, Stonepath permitted these companies to continue using "their existing policies and procedures to foster a 'decentralized entrepreneurial environment,'" id. ¶ 65, 66.

Using information said to have been provided by Confidential Witnesses 2-8,[6] the second amended complaint details

_____

[5](...continued)
the range of $9m to a $11m. . . .

As we've represented in our press release, we have also established <u>preliminary earnings targets for '05 in the $14m to $16m EBITDA range</u> and expected total revenue of $375m.

Id. ¶ 269 (emphasis added).  While plaintiffs offer conflicting allegations as to what Pelino said about 2005 earnings guidance, only their earlier allegation provides a particular date and context for the alleged comment.  We therefore credit the former for purposes of determining the date.  In other words, we assume that Domestic Services' contribution to the 2004 earnings guidance of $9-11 million was about $5 million.

[6] For confidential witnesses, the "underlying prerequisite [is] that each source is described sufficiently to support the probability that the source possesses the information
(continued...)

various problems with these legacy systems and accounting programs.  Because these allegations are unaltered from their previous iteration, we incorporate them by reference as detailed in our prior decision.  See <u>Stonepath</u>, 397 F.Supp.2d at 578-80.

Stonepath did not limit its acquisitions to domestic companies.  It also expanded into international transportation through its International Services segment.  Second Am. Compl. ¶ 3.  However, at least in 2002 and 2003, domestic operations outperformed international operations in terms of external customer revenue:  Domestic Services generated $129,474,000 in 2002 and $78,319,000 in 2003, while International Services generated $90,610,000 in 2002 and $44,469,000 in 2003.  <u>Id.</u> ¶¶ 5, 22, 317.  Therefore, assuming no other sources generated revenue from external customers for Stonepath, Domestic Services accounted for 59% of that revenue in 2002 and 64% in 2003.

### B.   The Restatements

During the Class Period, Stonepath issued three restatements that revised figures the company had previously reported to the SEC.

#### 1.   The First Restatement

On July 17, 2003, Stonepath issued a press release stating that it was discussing with the SEC the allocation of the purchase price for certain acquired companies -- Air Plus, United

---

[6](...continued)
alleged."  <u>Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.</u>, 394 F.3d 126, 155 (3d Cir. 2004).

American, and Global Transportation.  Id. ¶ 94.  Then, on August 28, 2003, Stonepath made its first Class Period restatement when it filed with the SEC an amended interim financial report on a Form 10-Q/A.  Id. ¶ 97.  This restated its consolidated financial statements for the periods ended June 30, 2003 and March 31, 2003, and for the years ended December 31, 2001 and December 31, 2002, by "(i) allocating more value to the customer relationship intangible assets for the Company's acquisitions and (ii) revising the amortization method and life used for such assets." Id.  The "consolidated statements of cash flows for net cash used in operating activities, net cash used in investing activities [and] net cash provided by (used in) financing activities in any of the restated periods" were not affected.  Id.

## 2.   The Second Restatement

On December 29, 2003, Stonepath issued a press release announcing its second Class Period restatement, the result of a problem in the legacy accounting process of the International Services division.[7]  Id. ¶ 98.  Revenues and transportation costs had been overstated in offsetting amounts, about $26.8 million

---

[7] The press release quoted Crain as stating:

Through the integration process, review of internal controls and centralization of the financial reporting process the Company has recently determined that the revenues and costs of transportation for its International Services division were overstated in like amounts because certain intercompany transactions representing the buying and selling of transportation services were not being appropriately eliminated in consolidation within the division's legacy accounting system.

Id. ¶ 98.

for the nine months ended September 30, 2003, and $16.9 million

for the year ended December 31, 2002.  Id.  There was no impact

on net revenues, net earnings, or earnings before interest,

taxes, depreciation and amortization ("EBITDA").  Id.

      During a December 31, 2003 conference call held to

discuss the restatement and to answer questions from analysts and

investors, Pelino said:

> The duplication of gross revenues at our
> international division should not have
> happened in a perfect world but it did. We
> discovered it and we corrected it. We have
> also taken steps to ensure that this never
> happens again by working closely with our
> external and internal auditors to improve
> their due diligence and field testing
> methodologies.

Id. ¶ 99.

> Crain explained:

> As part of our normal business process, we
> have audits done for all material
> transactions. As part of our public reporting
> process, we have our auditors do field work
> on a quarterly basis at each of our material
> business locations. Today that means we have
> people in the field every quarter in
> Minneapolis, Detroit, Seattle, and here in
> Philadelphia to make sure we're rolling up
> the right numbers. Also, as part of our
> public reporting process and the 302
> certifications under Sarbanes-Oxley, we hold
> quarterly calls with the leadership of each
> of the business units and go through a
> rigorous series of questions to try to ferret
> out any areas of concern or weakness in our
> financial reporting processes. We also meet
> regularly with the leadership of management
> of the business units to review business
> results.

Id. ¶ 101.

Responding to a question by Andrew Ponzo, a private investor, about financial reporting by the acquired companies' senior management, Crain said that "a local senior financial executive reports in to the local CEO.  So specifically, Jim Hilgert reports to Jason Totah in Seattle, and Tim Anderson report[s] in to Joe DiGiacomo and Gary Koch in Minneapolis with a dotted line responsibility back to me." <u>Id.</u> ¶ 102.  Pelino said:

> With respect to kind of the formality of the
> reporting, I think at the end of the day,
> people will have different views about where
> the dotted and solid line should be, but as
> long as the communication remains open and we
> have good candid conversations taking place,
> I think that can be made to work, and I do
> have the utmost confidence in the Jim
> Hilgert's and Tim Anderson's out there and
> their ability to do a good job for us.

<u>Id.</u>

Andrew Ponzo then stated his belief that the same type of incident would not occur again, but asked, "without having direct reporting into you or complete control over that, are there other instances that can happen, and if not [*sic*], how do we control that?"  <u>Id.</u> ¶ 103.  Pelino responded:

> [A]s I'm sure you're aware, Andrew, under
> Sarbanes-Oxley we're right now effectively
> identifying every material business process
> that exists across the business organization
> and will be going out and effectively
> benchmarking those practices against what are
> deemed to be best practices under general
> standards out there, and making sure that we
> have state-of-the-art internal controls
> across the entire organization. So through
> this process to the extent that there are any
> weaknesses they will be identified, and we'll
> either change them or put other mitigating
> processes in places to make sure that we
> cover our basis [*sic*]. So I think we can all
> take some comfort in getting our arms around

10

the universe of potential gotcha's and make
sure that we're focused on them.

Id.

On January 20, 2004, Stonepath filed a Form 10-K/A and three Forms 10-Q/A.  These Forms restated Stonepath's financial results by decreasing revenue and costs in like amounts for the year ended December 31, 2002 and for the quarters ended March 31, 2003, June 30, 2003, and September 30, 2003.  Id. ¶ 105.

### 3.   The Third Restatement

On September 20, 2004, Stonepath announced the need for a third Class Period restatement to revise its financial statements for fiscal year 2003 and for the first and second quarters of 2004.  Id. ¶ 279.  An internal review of Domestic Services revealed that its accrual process did not account for the differences between estimated and actual purchased transportation costs.  Id.  The under-accrual of actual costs was estimated to be from $4 to $6 million for 2003 and from $500,000 to $1 million for the first six months of 2004.  Id.  Stonepath stated that its reported EBITDA would be reduced to the range of $2.6 - $4.6 million for 2003 and $200,000 - $700,000 for the first six months of 2004.  Id.

Stonepath's press release described the need for the restatement:

> In using its legacy operating system, to be
> replaced by Tech-Logis later this year,
> Domestic Services relied on trend analysis to
> estimate its costs of purchased
> transportation.  In reviewing the process by
> which Domestic Services maintained the
> accrual for its costs of purchased

>transportation, the Company has concluded
>that the process did not accurately account
>for the differences between the estimates and
>the actual freight costs incurred.  This
>allowed for the accumulation of previously
>unidentified costs of purchased
>transportation and an under reported
>liability for the accrued costs of purchased
>transportation.

Id. ¶ 280.

Furthermore, Pelino announced changes in management. Jason Totah, the CEO of international operations, would also become the CEO at Domestic Services, putting "all of our logistics operations under one proven leader." Id. ¶ 281. Pelino also described restructuring of financial and accounting processes.  He mentioned that "senior financial staff of [the] Domestic Services and International Services operations [would] report directly to Bohn Crain, the Company's Executive Vice President and Chief Financial Officer." Id.

The day of these disclosures, Stonepath's common stock closed at $0.86 per share, down 46% from the prior closing price of $1.59, on volume of over 4.8 million shares. Id. ¶ 282.  The next day, and a day after the Class Period ended, Stonepath held a conference call in which Pelino and Crain participated.  Id. ¶ 283.  Plaintiffs allege that when asked about Stonepath's discovery of the understatement of transportation costs, "Crain stated that it would be fair to say that the Company discovered the issue in the last 30 days." Id. ¶ 285.

On January 6, 2005, Stonepath issued a press release concerning its financial results for the third quarter of 2004. Id. ¶ 289.  In that release, Stonepath also stated that the

estimated restatement figures announced in September would be increased, and would now extend back to 2001 and 2002:

> The Company expects to report an aggregate reduction in the previously reported net income for 2001 through the first six months of 2004 of approximately $16.3 million. Net income for 2001, 2002, 2003 and the first six months of 2004 is expected to be reduced by $0.4 million, $2.0 million, $7.8 million and $6.1 million, respectively.

Id. ¶ 289.  As a result, the earlier reported 2003 profit of $7.13 million became a loss of $670,000.  Id.  For the first six months of 2004, the previously reported net loss of $785,000 would be $6.1 million worse.  Id.

Also on January 6, 2005, Stonepath filed its quarterly report for the third quarter of 2004 on SEC Form 10-K.  Id. ¶ 290.  It disclosed that the restatement announced on September 20, 2004 "resulted in technical default of certain financial covenants of [its credit] Facility."  Id.  However, the defaults were "waived" and Stonepath entered into an amended credit facility which, inter alia, reduced the credit available from $25 million to $22.5 million, established new minimum quarterly EBITDA targets, precluded acquisitions, and eliminated LIBOR-based borrowing.  Id.

On February 11, 2005, Stonepath finally filed the restatement it had promised the previous September and then reiterated in January 2005.  Id. ¶ 293.  On a Form 10-K/A, Stonepath restated its financial results for fiscal years 2001 through 2003.  Id.  The Form 10-K/A stated that since the September 21, 2004 announcement, Stonepath had analyzed its costs

of purchased transportation and revenue transactions.  <u>Id.</u>  It found that:

> These errors resulted in an overstatement of revenues by $0.2 million in 2003, an understatement in purchased transportation costs by $4.4 million in 2003, $1.6 million in 2002, and $0.3 million in 2001 and an understatement of income tax expense of $2.0 million in 2003, $0.3 million in 2002 and $0.1 million in 2001.  These restatements also reduced goodwill by $4.3 million at December 31, 2003 and $1.3 million at December 31, 2002.  Net income was reduced by $7.9 million, including a reserve of $1.3 million related to excess earn-out payments in 2003, $1.9 million in 2002 and $0.3 million in 2001.

<u>Id.</u>  This restatement did not change net income for the first and second quarters of 2004, which, according to the January 6, 2005 press release, was expected to be reduced by $6.1 million.

During a conference call ten days earlier, Stonepath's newly appointed President, Bob Arovis, had repeated that "the restatements were caused by Stonepath's lack of understanding of its accrued purchase transportation liability and related costs for purchase transportation."  Arovis added these details about the restatement:

> The aggregate adjustment of 16.3 million is made up of three major components. The first part is the adjustments to net revenues in purchased transportation of 8.3 million. The remaining two parts were consequential effects of the first part, namely income tax effects of 3.6 million and issues with respect to earn-out payments for certain selling shareholders of 4.4 million. Specifically what I mean by consequential effects is that the Company's previously filed reports did not improperly record either the earn-out payments made, nor the taxes reflected in those filings. However, once we had to restate the earnings,

obviously, it impacted income taxes and
certainly impacted the process on which the
earn-outs were made.

Id. ¶ 292.

"Management's Report on Internal Control over Financial
Reporting," included in Stonepath's 2004 Form 10-K, filed on
April 1, 2005, rehearsed much of what Stonepath had already
publicly acknowledged: (1) changes had to be made to disparate
operating systems, financial systems, and financial policies and
procedures; (2) Stonepath had inadequate controls for assessing
the effectiveness of its internal control over financial
reporting and its consolidation process; and (3) controls related
to accounting for purchased transportation were inadequate,
resulting in selling shareholders receiving earn-out payments
greater than what they were actually owed, and creating the need
to restate public filings for fiscal years 2002 and 2003, as well
as for the first and second quarters of fiscal year 2004.  Id. ¶
297.  Regarding the earn-outs, the reduction of Air Plus's
previously reported cumulative earnings from $12.7 to $8.1
million meant that Stonepath paid about $3.9 million more to Air
Plus's selling shareholders that it should have.  Id. ¶¶ 298,
333.  It had also given the selling shareholder of United
American about $0.5 million in excess payments.  Id. ¶ 299.  In
both cases, Stonepath reclassified those excess payments "from
goodwill to advances due from shareholders."  Id. ¶¶ 298-99, 333.

15

C.   The Lawsuit

On September 24, 2004, four days after Stonepath announced its third restatement, lead plaintiff Globis filed this lawsuit against nominal defendant Stonepath and Dennis L. Pelino, Bohn H. Crain, and Thomas L. Scully.  Pelino is the Chairman of the Board of Directors and served as Chief Executive Officer of Stonepath from June 21, 2001 through October of 2004.  Id. ¶ 39. Crain was the Chief Financial Officer from January 10, 2002, and Treasurer from May 30, 2002 through the end of the Class Period. Id. ¶ 40.  Scully is a certified public accountant who served as Vice-President and Controller throughout the Class Period.  Id. ¶ 41.

The second amended consolidated class action complaint states two counts.  In Count I, Globis sues all defendants for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  In Count II, it sues the Individual Defendants for violation of Section 20(a) of the Exchange Act.

Before us now is defendants' motion to dismiss the second amended complaint.  Like the previous motion to dismiss, this motion contends that plaintiffs have failed to sufficiently plead scienter.  In the prior complaint, plaintiffs relied on both a recklessness theory and a motive and opportunity theory to establish scienter, but they have now removed all references to the latter theory and rest on a recklessness theory. Accordingly, we analyze the scienter allegations under the legal standard for pleading recklessness.

16

II.  Legal Standard

As noted, Count I of the second amended complaint alleges that defendants violated Section 10(b) of the Act and Rule 10b-5 promulgated thereunder.  Section 10(b) makes it illegal "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance . . . ."  15 U.S.C. § 78j(b) (2003).  Rule 10b-5 provides an enforcement mechanism for Section 10(b) by creating "a private cause of action for investors harmed by materially false or misleading statements."  In re Alpharma Inc. Sec. Litig., 372 F.3d 137, 147 (3d Cir. 2004).  Rule 10b-5 "makes it unlawful for any person '[t]o make any untrue statement of a material fact or to omit to state a material fact necessary to make the statements made in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security.'"  In re IKON Office Solutions, Inc., 277 F.3d 658, 666 (3d Cir. 2002) (quoting 17 C.F.R. § 240.10b-5(b)).

To state a valid claim for a violation of Section 10(b) and Rule 10b-5, a plaintiff must show that "the defendant (1) made a misstatement or an omission of a material fact (2) with scienter (3) in connection with the purchase or the sale of a security (4) upon which the plaintiff reasonably relied and (5) that the plaintiff's reliance was the proximate cause of his or her injury."  Id.; see also Sowell v. Butcher & Singer, Inc., 926 F.2d 289, 296 (3d Cir. 1991) (collapsing the first and third elements).

17

Plaintiffs' securities fraud claim is subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and to the Private Securities Litigation Reform Act of 1995 ("PSLRA") § 101(b), Pub. L. No. 104-67, 109 Stat. 737, 743 (codified at 15 U.S.C. § 78u-4 (2004)).  Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  See also In re Westinghouse Sec. Litig., 90 F.3d 696, 710 (3d Cir. 1996) (explaining that Section 10(b) claims must comply with Rule 9(b)).  Our Court of Appeals has explained that "Rule 9(b) requires, at a minimum, that plaintiffs support their allegations of securities fraud with all of the essential factual background that would accompany 'the first paragraph of any newspaper story'--that is, the 'who, what, when, where and how' of the events at issue."  In re Rockefeller Ctr. Props., Inc. Sec. Litig., 311 F.3d 198, 217 (3d Cir. 2002) (quoting In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1422 (3d Cir. 1997)).

The PSLRA imposes an additional "layer of factual particularity" for pleadings.  Rockefeller Ctr., 311 F.3d at 217. It requires a plaintiff who alleges that a defendant made an untrue statement of material fact to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1) (2004). Moreover, when the plaintiff must prove that the defendant acted with a particular state of mind, the complaint must "state with particularity facts giving rise to a strong inference that the

18

defendant acted with the required state of mind."  15 U.S.C. §
78u-4(b)(2) (2004); see In re Advanta Corp. Sec. Litig., 180 F.3d
525, 530-35 (3d Cir. 1999) (discussing how PSLRA modified
pleading requirements in securities fraud cases).

        Plaintiffs must sufficiently plead scienter if the
second amended complaint is to survive a motion to dismiss.  See
Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193, 96 S. Ct. 1375,
1381 (1976).  Scienter, in the context of securities fraud, is:

> a mental state embracing intent to deceive,
> manipulate or defraud, or, at a minimum,
> highly unreasonable (conduct), involving not
> merely simple, or even inexcusable
> negligence, but an extreme departure from the
> standards of ordinary care, . . . which
> presents a danger of misleading buyers or
> sellers that is either known to the defendant
> or is so obvious that the actor must have
> been aware of it.

IKON, 277 F.3d at 667 (citations and internal quotations
omitted).

        Conclusory allegations will not do under this
jurisprudence.  "[A]llegations that a securities-fraud defendant,
because of his position within the company, 'must have known' a
statement was false or misleading are 'precisely the types of
inferences which [courts], on numerous occasions, have determined
to be inadequate to withstand Rule 9(b) scrutiny.'"  In re
Advanta Corp. Sec. Litig., 180 F.3d at 539 (quoting Maldonado v.
Dominguez, 137 F.3d 1, 10 (1st Cir. 1998)); cf. In re Aetna Inc.
Sec. Litig., 34 F.Supp.2d at 953 (distinguishing Advanta on the
ground that it did not address scienter in context of
corporation's core business activities).  Rather to the point

here, "claims essentially grounded on corporate mismanagement are not cognizable under federal law." Advanta, 180 F.3d at 540 (quoting In re Craftmatic Sec. Litig., 890 F.2d 628, 638-39 (3d Cir. 1989)).

It is not enough for plaintiffs to "allege generally that defendants knew or recklessly disregarded each of the false and misleading statements for which [they were] sued," because "plaintiffs must allege facts that could give rise to a 'strong' inference of scienter." In re Burlington Coat Factory Sec. Litig., 114 F.3d at 1422 (citation and internal quotation omitted). Interpreting the "strong inference" requirement, our Court of Appeals has explained that "[p]laintiffs must either (1) identify circumstances indicating conscious or reckless behavior by defendants or (2) allege facts showing both a motive and a clear opportunity for committing the fraud." Id.; see also Advanta, 180 F.3d at 534-35 (discussing standards for pleading scienter in light of PSLRA). Allowing scienter to be established through recklessness "promotes the policy objectives of discouraging deliberate ignorance and preventing defendants from escaping liability solely because of the difficulty of proving conscious intent to commit fraud." Advanta, 180 F.3d at 535. Because plaintiffs here have now chosen to proceed solely under a recklessness theory, see Pls.' Mem. Opp'n Defs.' Mot. ("Pls.' Mem.) 14, we set forth the legal standard for that theory only.

A reckless statement involves "not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of

20

misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." Advanta, 180 F.3d at 535 (quoting McLean v. Alexander, 599 F.2d 1190, 1197 (3d Cir. 1979)).  Thus, scienter "requires 'a misrepresentation so recklessly made that the culpability attaching to such reckless conduct closely approaches that which attaches to conscious deception.'" In re Digital Island Securities Litigation, 357 F.3d 322, 332 (3d Cir. 2004) (quoting McLean v. Alexander, 599 F.2d at 1197 (3d Cir. 1979)).

III.  Analysis

Plaintiffs allege that "Defendants portrayed Stonepath as an increasingly profitable company positioned to expand and continue earnings growth through strategic acquisitions," despite the fact that they "knew, or recklessly disregarded, that Stonepath was plagued by internal control deficiencies, especially at Air Plus, the core component of the Company's most important subsidiary, Domestic Services." Id. ¶ 6.  Air Plus's control deficiencies allegedly caused it to consistently understate transportation expenses -- its largest operating cost -- which resulted in materially inflated Class Period earnings. Id. These cost understatements are also said to have caused Stonepath to overpay millions of dollars to former Air Plus shareholders, who, under the terms of the acquisition agreement, were entitled to earn-out payments when Air Plus met certain earnings targets.  Id.  Finally, the understatements are also said to have caused defendants to overstate important financial

benchmarks and earnings estimates.  Id. ¶ 7.  When Stonepath
issued its three restatements, plaintiffs allege that "the truth
emerged . . . that far from being a profitable growth company,
Stonepath was, in fact, a company with a greater than reported
loss for 2001, minimal earnings for 2002, and no earnings for
2002 through the first six months of 2004."  Id.

        In moving to dismiss the second amended consolidated
complaint, defendants contend that plaintiffs have failed to
sufficiently plead scienter.  Plaintiffs respond that their
latest complaint pleads the requisite scienter under a
recklessness theory.

### B.   Section 10(b) and Rule 10b-5

        Plaintiffs advance two main arguments in support of
their recklessness theory.  First, they contend that defendants'
conduct constitutes an extreme departure from the standards of
ordinary care, largely because they failed adequately to monitor
transportation costs at the core business, Domestic Services.
Second, they assert that Koch's financial interest in Domestic
Services' performance gave rise to defendants' heightened duty to
monitor transportation costs at Air Plus.

        Before addressing the parties' contentions, we note
that we will not rehash findings from our earlier decision that
the parties have not called into question by presenting relevant
new facts or arguments.  In particular, we reiterate that the
third restatement's magnitude was "undeniably large, and
therefore relevant, but alone it does not establish

recklessness," In re Stonepath Group, Inc. Sec. Litig., 397
F.Supp.2d at 588, and that "transportation revenues are central
to Stonepath's business," id. at 590-91.  With that foundation in
mind, we turn to plaintiffs' arguments.

Plaintiffs first argue that defendants' conduct
constitutes an extreme departure from the standards of ordinary
care.  They contend that they have satisfied our previous
directive to "show that Domestic Services' transportation costs
are at the core of Stonepath's business," id. at 591, and that
defendants therefore had a duty to monitor the accuracy and
integrity of its process for reporting of transportation costs.
Because Stonepath is said to publicly report transportation costs
on a consolidated basis, plaintiffs are unable to provide precise
figures on the transportation costs of Domestic Services and its
various divisions.  See Pls.' Mem. 16.  These figures are
exclusively within defendants' control, so we shall not penalize
plaintiffs for not producing them.  See In re Burlington Coat
Factory Sec. Litig., 114 F.3d at 1418 (relaxing Rule 9(b)'s
requirements "where the factual information is peculiarly within
the defendant's knowledge or control," but affirming that even in
such cases "boilerplate and conclusory allegations will not
suffice" and "[p]laintiffs must accompany their legal theory with
factual allegations that make their theoretically viable claim
plausible.").

In fact, the figures that plaintiffs provide are
sufficient to show that Domestic Services was indeed the dominant
subsidiary, at least in 2002 and 2003.  As already detailed,

23

Domestic Services generated 59% of Stonepath's external customer revenue in 2002 and 64% in 2003.  Moreover, earnings from Air Plus were critical to Stonepath's profitability from at least 2001 through 2003.  By 2004, it seems the domestic and international operations may have been of roughly equal importance in terms of EBITDA, given Pelino's statement that Domestic Services was responsible for about half of Stonepath's projected 2004 earnings.  However, drawing all reasonable inferences in plaintiffs' favor, we find that they have adequately pled that Domestic Services was the dominant subsidiary for most of the Class Period, so Domestic Services' transportation revenues had greater financial import for Stonepath than International Services' transportation revenues.

Accepting that as true, we must consider whether we can impute knowledge of Air Plus's accounting deficiencies to the Individual Defendants.  Plaintiffs do not challenge our previous finding -- based on the figures reported in Stonepath's Form 10-K and the third restatement -- that Stonepath's transportation costs were $153,718,000 in 2003 and $84,478,000 in 2002, and that transportation costs were understated by $4.4 million for 2003 and $1.6 million for 2002, i.e., less than 2.9% of transportation costs for 2003 and 1.9% in 2002.  We found before, and reaffirm today, that variances of 2.9% and 1.9% were not of such magnitude that defendants could be deemed to have known about, or been suspicious of, accounting improprieties.

In reaching that decision, we relied on In re Alpharma Inc. Securities Litigation, 372 F.3d 137 (3d Cir. 2004).  In that

securities fraud case, improper accounting methods used at a
Brazilian subsidiary affected Alpharma's net income.  The Court
of Appeals found that plaintiffs did not adequately plead that
defendants knew about the accounting irregularities.  The panel
noted the complaint was "devoid of any allegations" that AHD's
Brazil division was "so central to Alpharma's business" that
company executives should have noticed the Brazil division's
increased reported revenues.  Id. at 151.  It further observed
that "the Brazil division's *total* revenue accounted for only
slightly more than one half of one percent of the company's total
revenue in 1999."  Id. (emphasis in original).

        Plaintiffs contrast those small numbers with Domestic
Services' demonstrated importance to Stonepath's profitability.
Despite Domestic Services' significance, we must still consider
whether the relatively small variances should have warned the
Individual Defendants of accounting problems.  Indeed, even if we
assume that Domestic Services was only responsible for half of
Stonepath's transportation costs (i.e., $76,859,000 in 2003 and
$42,239,000 in 2002), Domestic Services then understated its
transportation costs by 5.7% in 2003 and less than 3.8% in 2002.
Given these relatively small margins, we look to when other
courts in this jurisdiction imputed knowledge to defendants in
securities cases.

        Of course, knowledge that a statement was false or
misleading cannot be imputed to a defendant simply because he or
she held a certain position within a company.  See Advanta, 180
F.3d at 539.  Our courts have repeatedly held, however, that

25

knowledge of core activities of a business may be imputed to its highest officials in some circumstances.  For instance, courts have found that allegations were sufficiently pled that director and officer defendants knew or should have known they were making misstatements where a defendant personally and often solely negotiated some transactions and participated in many others that were "a significant part" of a company's business and which the Court found "involved misstatements," In re Tel-Save Sec. Litig., C.A. No. 98-3145, 1999 WL 999427, at *5 (E.D. Pa. Oct. 19, 1999); where defendants participated in discussions about improper company practices during which others expressed reservations about those practices and even called for them to stop, see In re Campbell Soup Co. Sec. Litig., 145 F.Supp.2d 574, 599 (D.N.J. 2001); and where defendants occupied the top corporate positions during an $8.9 billion merger that was plagued with "widespread integration problems," In re Aetna Inc. Sec. Litig., 34 F.Supp.2d 935, 953 (E.D. Pa. 1999).  Even where a company's "premier product" is at issue, "this fact alone does not warrant imputing to the Individual Defendants knowledge of subtleties discernable only through detailed study of monthly and quarterly . . . data." In re Bio-Technology General Corp., 380 F.Supp.2d 574, 597 (D.N.J. 2005); but cf. In re Viropharma, Inc., Sec. Litig., No. 02-1627, 2003 WL 1824914, at *9 (E.D. Pa. Apr. 7, 2003) (imputing knowledge where pharmaceutical company's "highest ranking members" alleged to have misstated information about the company's leading drug product undisputedly had access to

clinical trial reports questioning the efficacy and safety of that drug).

While none of these courts expressly held that imputable information had to be easily discoverable, the Courts plainly did <u>not</u> impute knowledge absent particularized allegations showing that defendants had ample reason to know of the falsity of their statements.  Thus, while courts will impute knowledge of core activities in some cases, they do so cautiously.  Given our Court of Appeals's recent reminder that "'[g]eneralized imputations of knowledge' do not satisfy the scienter requirement 'regardless of the defendants' positions within the company,'" <u>Alpharma</u>, 372 F.3d at 149 (quoting <u>Advanta</u>, 180 F.3d at 539), caution is not simply prudent, it is required.

Indeed, we have further reason to tread carefully in this area when we consider the cases that the court in <u>Alpharma</u> approvingly cited.  <u>See</u> 372 F.3d at 151.  In <u>Kushner v. Beverly Enterprises, Inc.</u>, 317 F.3d 820 (8th Cir.2003), the court noted that "'the failure of a parent company to interpret extraordinarily positive performance by its subsidiary . . . as a sign of problems and thus to investigate further does not amount to recklessness under the securities laws'." <u>Id.</u> at 829 (quoting <u>Novak v. Kasaks</u>, 216 F.3d 300, 309 (2d Cir. 2000)).  In <u>Chill v. General Electric Co.</u>, 101 F.3d 263 (2d Cir. 1996), the Second Circuit held that "[g]iven the significant burden on the plaintiff in stating a fraud claim based on recklessness, the success, even the extraordinary success, of a subsidiary will not suffice in itself to state a claim that the parent was reckless

in failing to further investigate[, and] [f]raud cannot be inferred simply because [the parent corporation] might have been more curious or concerned about the activity at [its subsidiary]."  Id. at 270.  Lastly, Alpharma cited In re Comshare, Inc. Securities Litigation, 183 F.3d 542 (6th Cir. 1999), where the Sixth Circuit cited Chill for the proposition that courts "should not presume recklessness or intentional misconduct from a parent corporation's reliance on its subsidiary's internal controls."  Id. at 554.

Thus, even though we accept that Domestic Services was the more important of Stonepath's two subsidiaries and that Air Plus's earnings were key to Stonepath's profitability from 2001 to 2003, the relevant jurisprudence prevents us from reflexively imputing to the Individual Defendants knowledge of a subsidiary's under-reporting of transportation costs.  We cannot do so absent strong indications that those defendants had sufficient reason to know of, or be suspicious about, the defective accounting system. See also Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000) ("Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information.").

Notably, plaintiffs have not alleged that Domestic Services' financial reports were unusual or out of line with expectations.  They have not alleged that Air Plus's earning targets of $6 million were unrealistic, and that the Individual Defendants therefore should have been suspicious when Air Plus realized those goals.  While plaintiffs have adequately pled that

28

some people in field offices knew of Air Plus's accounting systems deficiencies, they still have not pled "particularized facts showing that the information about under-accrual -- or, for that matter, <u>any</u> of the alleged accounting and financial reporting problems described by their confidential witnesses -- reached defendants well before Stonepath's restatements." <u>Stonepath</u>, 397 F.Supp.2d at 589.

We also find it telling that throughout the Class Period, while the Individual Defendants were allegedly artificially inflating stock prices with their fraudulent misrepresentations, they were simultaneously <u>buying</u> Stonepath stock.[8]  Pelino bought 100,000 shares on February 27, 2003[9] and 25,000 shares on May 7, 2004.[10]  As of the latter date, he was the beneficial owner of 431,222 shares.[11]  In March of 2003, Pelino accepted shares instead of a minimum cash bonus of $360,000 that he was otherwise entitled to under his employment

---

[8] Under <u>Oran v. Stafford</u>, 226 F.3d 275, 289 (3d Cir. 2000), we can take judicial notice of public disclosure documents filed with the SEC.  <u>See also</u> <u>Advanta</u>, 180 F.3d at 540 (drawing information from Form 4s filed with the SEC and attached to defendants' motion to dismiss).  Accordingly, we take notice of the SEC filings that defendants cite to establish their stock purchases, which they attached to their first motion to dismiss as Exhibits C, D, E and F.

[9] <u>See</u> Pelino's Form 4, Feb. 27, 2003, <u>available at</u> http://www.sec.gov/Archives/edgar/data/1093546/000095011603001846/form4.htm.

[10] <u>See</u> Pelino's Form 4, Mar. 10, 2004, <u>available at</u> http://www.sec.gov/Archives/edgar/data/1093546/000095011604001480/xslF345X02/p331876_ex.xml.

[11] <u>Id.</u>

agreement,[12] and for his 2003 bonus, Pelino accepted options to buy 675,600 shares instead of a $1,080,000 cash bonus.[13]  Crain and Scully also purchased Stonepath stock during this time. Crain bought 79,897 shares between May 7, 2004 and June 30, 2004, and beneficially owned 97,497 shares as of June 30, 2004.[14] Scully bought 879 shares on June 30, 2004, and beneficially owned 7,779 shares.[15]

Plaintiffs do not challenge that, rather than selling stock during the Class Period, the Individual Defendants were actually buying more.  Nor do plaintiffs offer any theory that would reconcile their allegations with these defendants' actions. The Individual Defendants' investment actions negate an inference that they were aware of or recklessly disregarded financial reporting problems.  See Advanta, 180 F.3d at 540-41 ("Far from supporting a 'strong inference' that [two] defendants had a motive to capitalize on artificially inflated stock prices," their sales of 7 percent and 5 percent of their holdings, plus one's continued ownership of a "sizable percentage of Advanta's

---

[12] See Stonepath's Form 14-A at 24, Apr. 8, 2004, available at http://www.sec.gov/Archives/edgar/data/1093546/000095011604001173/def14a.txt.

[13] Id.

[14] See Crain's Form 4, May 10, 2004, available at http://www.sec.gov/Archives/edgar/data/1093546/000095011604002066/xslF345X02/p332920_ex.xml, and Form 4, July 2, 2004, available at http://www.sec.gov/Archives/edgar/data/1093546/000095011604001479/xslF345X02/p331877_ex.xml.

[15] See Scully's Form 4, July 2, 2004, available at http://www.sec.gov/Archives/edgar/data/1093546/000095011604002069/xslF345X02/p332919_ex.xml.

outstanding stock" in fact suggested "they had every incentive to keep Advanta profitable").

Plaintiffs have failed to plead facts showing that the Individual Defendants were presented with suspicious earnings figures or information that would call into question otherwise reasonable earnings reports.  We therefore cannot impute knowledge to those defendants of the deficiencies of an accounting program used by a subsidiary, albeit an important one.

Perhaps recognizing that Domestic Services' reported earnings would not alert the Individual Defendants to accounting problems, plaintiffs introduce another theory regarding the relevance of the understated costs.  They contend that the under-reported transportation costs should be measured by reference to their impact on net income and earnings.  In other words, they ask us to assess the Individual Defendants' scienter based on the impact that the under-reporting had on Stonepath's net income and earnings, and not on whether the transportation costs Domestic Services actually reported should have appeared suspect to the senior corporate officers.

To establish the validity of this theory, plaintiffs rely on four district court cases, Carley Capital Group v. Deloitte & Touche, 27 F.Supp.2d 1324 (N.D. Ga. 1998); In re Wellcare Management Group, Inc. Securities Litigation, 964 F.Supp. 632, 636, 638-40 (N.D.N.Y. 1997) (finding scienter adequately pled under two theories -- motive and opportunity and conscious and reckless behavior -- where earnings per share fell by 50% and 75% for the two years preceding a restatement);  In re

Miller Industries, Inc. Securities Litigation, 120 F.Supp.2d
1371, 1382 (N.D. Ga. 2000) (citing Carley for the proposition
that "alleged GAAP violation must be combined with other factors,
such as a drastic overstatement of financial results, to give
rise to a strong inference of scienter"); and Chu v. Sabratek
Corp., 100 F.Supp.2d 827 (N.D. Ill. 2000) (denying in part motion
to dismiss because the facts alleged raised strong inference of
intentional or reckless false statements where some defendants
had reason to know of improper accounting).  A review of these
cases shows that the particularized facts those plaintiffs
alleged gave reason to find that the defendants knew of, or had
reason to be suspicious about, allegedly improper accounting
practices.  Moreover, the holdings do not support the theory that
plaintiffs advance.

          In Carley Capital Group v. Deloitte & Touche, the
plaintiffs sued an accounting firm "heavily involved" in the
management of a company.  27 F.Supp.2d at 1339.  The defendant
allegedly "specifically direct[ed] the inclusion of $12.5 million
of revenues and income" in violation of the Generally Accepted
Accounting Principles ("GAAP") and of the company's own revenue
recognition policy, and issued an unqualified audit opinion that
the financial statements conformed with the GAAP.  The accounting
firm did all this despite having advised the company that it was
understating expenses and overstating income.  Id. at 1330-31.
The court did not find sufficient allegations of reckless
behavior based only on the misstatements' impact on the company's
profitability.

The court in <u>Wellcare</u> found that plaintiffs alleged "facts tending to show negligence that is tantamount to intent" where a company's president and CFO/Vice-President of Finance were alleged to have "had knowledge of, condoned, and/or encouraged" deliberate earnings overstatement, demands for unwarranted checks, demand for, and receipt of, checks for nonexistent deficits, misstatement of assets, improper treatment of an acquisition as a purchase rather than a consolidation, and recognition of a license fee without having received payment or assurance of payment.  964 F.Supp. at 635-36, 640.  The court's analysis does not suggest that its holding was grounded on the earnings overstatements' effect on earnings per share.

In <u>Chu</u>, the court held that plaintiffs alleged "specific facts" concerning an alleged mischaracterization of $39 million in research and development expenses as intangible assets rather than expenses, and "[f]or this reason" it did not dismiss the claims against certain defendants.   100 F.Supp.2d at 840. Again, the court's decision did not rely on how the allegedly improper accounting affected reported earnings.

In short, plaintiffs have not pointed to any authority that would permit us to find scienter simply because a misstatement materially impacted net income and earnings.  We therefore will not adopt such a theory.  Instead, we analyze the scienter allegations under the established jurisprudence as we have described it.

Plaintiffs also ask us to apply the materiality analysis from <u>Ganino v. Citizens Utilities Co.</u>, 228 F.3d 154,

33

163-65 (2d Cir. 2000).  But defendants here are challenging the sufficiency of the allegations as they concern scienter, not materiality, and these are two distinct elements under a Section 10(b) analysis.  See In re IKON Office Solutions, Inc., 277 F.3d 658, 666 (3d Cir. 2002) (stating five elements for claim brought under Section 10(b) and Rule 10b-5).  Plaintiffs have cited no authority in our Circuit or any other that would permit us to take the novel approach of conflating the legal standards for these two elements.  Because only scienter is at issue here, we apply, as we must, the well-developed legal standards for this particular element of a Section 10(b) claim.

In sum, plaintiffs have failed to plead facts showing that Domestic Services' inaccurate transportation cost accounting was known to, or should have been obvious to, defendants at any point significantly prior to Stonepath's restatement announcements.  Thus, plaintiffs' theories and alleged facts in support of their first argument fail to give rise to the requisite strong inference of scienter.

Plaintiffs' second argument is that the earn-out arrangements used to purchase Air Plus and United American -- and particularly Koch's dual position as a beneficiary of the Air Plus earn-out payments and as the CEO of Domestic Services and Air Plus -- created for defendants a "heightened duty to monitor the accuracy of the data underlying the financial results reported by Air Plus."  Second Am. Compl. ¶ 71.  As a majority shareholder in Air Plus, Koch, along with other former Air Plus shareholders, was entitled to, and did in fact receive, earn-out

payments when Air Plus met certain earnings targets.  Plaintiffs allege that his financial interest as a seller is a distinguishing factor, and they reject defendants' argument that Koch's interest is akin to any executive who might have a generalized motive to maximize his or her company's earnings to receive bonuses, stock options, and promotions.

To establish the existence of this heightened duty, plaintiffs cite SEC v. Aqua-Sonic Products Corp., 524 F. Supp. 866, 880 (S.D.N.Y. 1981), aff'd, 687 F.2d 577 (2d Cir. 1982), and Larami Corp. v. Amron, No. 91-6145, 1995 WL 128022 (E.D. Pa. Mar. 23, 1995), aff'd, 91 F.3d 166 (Fed. Cir. Apr. 19, 1996).  Neither of these cases supports plaintiffs' proposition.

We first note that SEC v. Aqua-Sonic Products Corp. is a Second Circuit pre-PSLRA case, so it was not decided under the jurisprudence to which we are now bound.  Putting aside that crucial difference for the moment, Aqua-Sonic bears no resemblance to this litigation.  There, a trial revealed that defendants, partners in an enterprise and attorneys themselves, had twice been advised by outside law firms that their enterprise might be covered by the securities laws.  524 F. Supp. at 880. After an employee researched the matter and the partners discussed it, they concluded that this advice was incorrect and therefore chose not to comply with the securities laws.  Id.  The court found that the failure to obtain another outside opinion and reliance on the opinion of attorneys with a financial interest in the enterprise was reckless.  Id.  By contrast, plaintiffs here offer no particularized allegations that the

35

Individual Defendants ignored advice from auditors or legal counsel that Air Plus's accounting system might be deficient.

Plaintiffs' second citation, <u>Larami Corp. v. Amron</u>, is neither a securities case nor a PSLRA litigation.  It is a case arising out of alleged patent and trademark infringement of toy water guns, and plaintiffs' citation to that court's discussion of a commercial disparagement claim has no relevance to this post-PSLRA case.

Thus, neither of plaintiffs' citations supports the proposition that defendants had a "heightened" duty to monitor Air Plus's accounting because of Koch's earn-out payments. Moreover, Domestic Services had its own CFO, Joe DiGiacomo, and Controller, Jim Anderson.  Even if, as plaintiffs allege, Messrs. DiGiacomo and Anderson knew of the accounting problems,[16] nothing alleged suggests that those officers had a particularized motive to inflate their subsidiaries' reported earnings, or that defendants were reckless in relying on their underlings' work.

Plaintiffs also suggest that Koch's resignation, and the defendants' alleged failure to elaborate on its circumstances, is telling for purposes of scienter.  Koch's departure, by itself, tells us nothing about the Individual

_____

[16] On such a hypothesis, DiGiacomo and Anderson would be in the same scienter shoes as the officers in our Court of Appeals's recent <u>In re Suprema Specialties, Inc. Securities Litigation</u>, 438 F.3d 256, 279-80 (3d Cir. 2006) (finding "specific knowledge" where officers "signed millions of dollars in company checks during the class period" and "controlled all of the bookkeeping connected with the accounts" at issue).

Defendants' mental state when they were reviewing Domestic
Services' earning reports.

To recapitulate, the second amended complaint details
three restatements, each concerning a different financial
reporting problem within Stonepath.  The final restatement, which
materially affected Stonepath's profitability during the Class
Period, was necessary because an accounting program used within
an important division of Stonepath's dominant subsidiary failed
to accurately record the difference between estimated and actual
transportation costs.  Plaintiffs allege that the Individual
Defendants, who later admitted to a "lack of understanding" of
this process, were reckless in failing adequately to monitor
Domestic Services' transportation costs both because it was a
core business and because its CEO was a former Air Plus
shareholder who received earn-out payments when Air Plus achieved
certain benchmarks.

Despite Domestic Services' importance, we hold, for the
reasons discussed at length herein, that plaintiffs have failed
to plead particularized facts demonstrating that the Individual
Defendants, who continued to invest in Stonepath stock during the
Class Period, acted with the requisite level of scienter.

B.   Section 20(a)

In Count II, the second amended complaint alleges that
the defendants violated Section 20(a) of the Act, 15 U.S.C. §
78t(a) (2004).  That section imposes joint and several liability
on one who controls a corporation that violates federal

securities laws.  The defendants suggest that we should dismiss this claim because plaintiffs fail to plead their other federal claim adequately and a Section 20(a) claim will not lie when there are no actionable independent underlying violations of the Act.  See In re Advanta Corp. Sec. Litig., 180 F.3d at 541; see also In re Rockefeller Center Properties, Inc., 311 F.3d 198, 211 (3d Cir. 2002) ("[I]t is well-settled that controlling person liability is premised on an independent violation of the federal securities laws.").

Because we read the allegations in the latest complaint as insufficient to state a claim for violation of Section 10(b) of the Act for purposes of this motion to dismiss, we shall dismiss the Section 20(a) claim.

IV.  Conclusion

Plaintiffs have again failed to allege particularized facts that create a strong inference that defendants acted with the scienter that the law requires.  We therefore grant defendants' motion to dismiss and bring this litigation to a close before us.

BY THE COURT:

/s/ Stewart Dalzell, J.